FILED —— ENTERED
LODGED —— RECEIVED

APR 27 2007    LK

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

1

2

3

4

5   **07-CV-00645-CMP**

6

7

8   UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  ROMEO BALEN, individually, and
on behalf of all others similarly
situated,

11

12                     Plaintiff,

13         v.

14  HOLLAND AMERICA LINE,
INC.,

15

16                     Defendant

17

) AT LAW AND IN ADMIRALTY
)
)
)
)
)
) No. **C 07-0645** RSm
)
) **COMPLAINT—CLASS ACTION**
)
)      **JURY DEMAND**
)
)
)
)
)
)

18      Plaintiff ROMEO BALEN, individually and on behalf of all others similarly situated, brings

19  this Class Action Complaint against Defendant, HOLLAND AMERICA LINE INC., ("HAL") for

20  breaching terms of the employment agreement existing between each and every Filipino seafarer

21  and HAL, and violating the Seaman's Wage Act, 46 U.S.C. § 10313(f) & (g).  Fundamentally,

22  HAL initially paid the transportation expenses of the Filipino seafarers employed by HAL, and

23  later, in contravention if its employment agreement and Seaman's Wage Act, wrongfully compelled

24  the Filipino seafarers to reimburse HAL for these transportation expenses out of the seafarers'

25  wages.  Plaintiff alleges:

26

COMPLAINT –CLASS ACTION - 1

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

# I. **PARTIES**

**Plaintiff**

1. Plaintiff is a Filipino who worked aboard one of Defendant HAL's vessels as a seafarer-employee.

2. Plaintiff's terms of employment with HAL are governed by the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels, a copy of which is attached hereto. The Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels is promulgated by the Philippine Overseas Employment Agency ("POEA") and incorporated by reference in the Plaintiff's standard POEA form Contract of Employment, a copy of which is attached hereto.

3. Plaintiff was discharged from one of HAL's vessels upon which he was employed upon the termination of a voyage ending in a U.S. ports, and was, at the time of his discharge, not paid his full wages as owed by HAL.

**Defendant HAL**

4. Defendant HAL is a corporation organized and existing under the laws of the state of Washington, with its headquarters in Seattle. At all times material hereto, HAL was Plaintiff's employer and owner and operator of the vessels on which Plaintiff was employed.

5. HAL publicizes its history and profile as follows: HAL was founded in 1873 as the Netherlands-America Steamship Company, a shipping and passenger line. Because it was headquartered in Rotterdam and provided service to the Americas, it became known as Holland America Line. Within 25 years, Holland America owned a fleet of six cargo and passenger ships, and provided shipping and passenger services between Holland and the Dutch East Indies via the newly constructed Suez Canal. The line was a principal carrier of immigrants from Europe to the United States until well after the turn of the century. Though transportation and shipping were the primary sources of revenue, in 1895 the company offered its first vacation cruise; its second leisure

COMPLAINT –CLASS ACTION - 2

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1  cruise, from New York to the Holy Land, was in 1910. Finally, in 1971, Holland America
2  suspended its transatlantic passenger trade and, in 1973, the company sold its cargo shipping
3  division. Cruise vacations became the line's full time focus. In 1989, Holland America Line Inc.
4  became a wholly owned subsidiary of Carnival Corporation & plc., the largest cruise company in
5  the world. In 2007, the HAL line operates 13 ships, offering nearly 500 cruises, which sail to more
6  than 320 ports of call on all seven continents, carrying more than 700,000 cruise passengers a year.
7  Based in Seattle, Washington, one of HAL's six home ports is Fort Lauderdale, Florida.

8  ## II. JURISDICTION AND VENUE

9      6.   This Court has jurisdiction over this action, which implicates over $5 million in
10  damages, pursuant to the Seaman's Wage Act 46 U.S.C. § 10313(f) & (g), admiralty and maritime
11  jurisdiction under 28 U.S.C. § 1333, and federal question jurisdiction pursuant to 28 U.S.C. § 1331,
12  diversity jurisdiction pursuant to 28 U.S.C. § 1332, and class action jurisdiction pursuant to 28
13  U.S.C. § 1332.

14      7. This Court has personal jurisdiction over Defendant is proper in the Western District of
15  Washington because Defendant resides and maintains its world-wide base of operations in
16  Washington. In addition, a substantial part of the events set out in this Complaint, and a substantial
17  part of the Defendant's acts constituting violations of the Seaman's Wage Act, occurred in whole
18  or in part in the Western District of Washington. Moreover, Defendant, at all times material to the
19  allegations contained in this Complaint, personally and/or through an agent:

20          a. Operated vessels in the waters of this state and district.

21          b. HAL also: Personally and/or through an agent operated, conducted, engaged in
22          and carried on a business venture in the Western District of Washington or had an
23          office or agency in the Western District of Washington; and/or

24          c. Personally or through an agent engaged in substantial activity within this state
25          and district.

26

COMPLAINT –CLASS ACTION - 3

Harris & Moure
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

8. Venue is also proper in this district pursuant to 28 U.S.C. §1391(c) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Western District of Washington and, as set forth in the preceding paragraph, Defendant is subject to personal jurisdiction in this District.

### III. FACTUAL ALLEGATIONS

9. Plaintiff BALEN worked for Defendant HAL aboard the M/V Westerdam.

10. Section 3 of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels, referenced previously, "FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION", provides:

> The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed **at the expense of the employer**.

*See* attached composite exhibit. (Emphasis added).

11. Plaintiff BALEN joined the HAL vessel for duty at the date and time specified by HAL, and HAL initially paid the expense of BALEN's transportation by air or as otherwise directed to join the vessel.

12. Upon arriving on the vessel, Defendant HAL demanded Plaintiff BALEN to pay HAL $2,119.00 out of his wages for the expense HAL initially paid for BALEN's transportation. *Id.*

13. HAL coined its demand a "reimbursement advance" or "Deployment Cost Re-Payment," *Id.*, and outlined this demand in writing as follows: "The Purser will give you your entire pay. You will be required to hand back to the Purser your reimbursement amount," *Id.*

14. HAL, moreover, confessed in writing that it contrived "reimbursement" as a means to make the seafarer pay for his travel expense as a willful and specious attempt to circumvent "American law that prohibit[ed] [HAL] employers from deducting such costs directly." *Id.*

15. The demand amount represented almost a third of the $6,885.00 Plaintiff BALEN hoped to

COMPLAINT --CLASS ACTION - 4

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1  earn in his year-long contract, in a job which required Plaintiff BALEN to work upwards of twelve
2  hours-a-day, seven-days-a-week. Defendant HAL effectively required Plaintiff BALEN to pay
3  $0.48 from his meager $1.57 per hour guaranteed pay.

4      16. Plaintiff Balen could only afford to pay $575.00 of the $2,119.00 amount demanded in the
5  time demanded. On March 3, 2006, HAL fired Plaintiff Balen for failing to reimburse from his
6  wages the full amount ostensible dues as a "reimbursement," and thereafter discharged Plaintiff
7  Balen from employ from the vessel M/S Westerdam in Port Everglades, Fort Lauderdale, Florida,
8  U.S.A. *See* attached composite exhibit.

9      17. HAL made the same demand for "reimbursement" of all Filipino seafarers on all of its ships
10  that HAL made of BALEN, apparently since in or around May 2004. Indeed, HAL's demands for
11  "reimbursement" of all Filipinos seafarers, who number in excess of an estimated 2,500 at any
12  given time, was part of HAL's corporate-wide, computerized plan, which extracted in excess of
13  $20 million in undeserved profits from the pockets of desperate, poorly paid seamen.

14      18. HAL failed to return any of the "reimbursement" it extracted from Plaintiff BALEN after
15  his discharge and Defendant HAL did not return to any discharged Filipino seafarer any amounts
16  paid by these seafarers to HAL under this "reimbursement" scheme.

17      19. Defendant implemented this scheme from its headquarters in Washington to force all
18  Filipino seafarers to pay their travel expenses from their wages, notwithstanding the aforesaid
19  Section 3 of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers
20  On Board Ocean Going Vessels, which Section mandates HAL pay these expenses.

21      20. Defendant implemented this scheme to force all Filipino seafarers to pay their travel
22  expenses from their wages, notwithstanding that by forcing the seafarers to pay from their wages,
23  HAL was violating the Seaman's Wage Act.

24      21. Defendant HAL did not state which American law it was attempting to circumvent when it
25  noted it was obtaining reimbursement for the travel expenses from Plaintiff's and the purported
26

COMPLAINT –CLASS ACTION - 5

Harris & Moure
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax  (206) 224-5659

1    class' wages as a means to avoid American law.  However, the effort was unsuccessful because
2    such "reimbursements" violates the Wage Act.

3        22.  All conditions precedent for Plaintiff's claims are satisfied, have been performed or have
4    occurred.

5                                    **IV.  CLASS ALLEGATIONS**

6        23.  Plaintiff brings this action as a class action against Defendant pursuant to Rule 23(a)
7    and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly
8    situated. The Class is defined as:

9
10           All former and current Filipino seafarer-employees of HAL, who have worked
             and/or are working for HAL aboard HAL vessels pursuant to the POEA Contract
             of Employment, from whom HAL obtained reimbursement from the seafarers'
11           wages for HAL's payment of the seafarers' travel expenses to join a HAL vessel
             or be available for duty for HAL.  Excluded from the Class are (a) Defendant,
12           and its officers and directors, and (b) the immediate family members of
             Defendant's officers and directors.
13

14       24.  There will be a subclass of seamen which fall within the above definition yet because
15   they were discharged in U.S. port or harbor, are entitled to additional relief.  This subclass is
16   defined as:
             **U.S ports or harbors subclass:**  All former and current Filipino seafarer-
17           employees of HAL, who have worked and/or are working for HAL aboard HAL
             vessels pursuant to the POEA Contract of Employment, from whom HAL
18           obtained reimbursement from the seafarers' wages for HAL's payment of the
             seafarers' travel expenses to join a HAL vessel or be available for duty for HAL,
19           and to whom HAL did not pay the balance of wages due, the "reimbursement
             amount" after the seafarers' discharge from the vessels upon which they
20           are/were employed at the termination of voyages in U.S. ports or harbors.
             Excluded from the Class are (a) Defendant, and its officers and directors, and (b)
21           the immediate family members of Defendant's officers and directors.

22       **Numerosity**
23
         25.  The members of the Class are so numerous and geographically dispersed throughout
24
     the United States and abroad that joinder of all Class members is impracticable. The Class, upon
25
     information and belief, consists of thousands of Filipino seafarers, whose computerized records
26
     COMPLAINT –CLASS ACTION - 6                          **Harris & Moure**
                                                    *A Professional Limited Liability Corporation*
                                                          720 Olive Way, Suite 1000
                                                             Seattle, WA 98101
                                                         Phone: (206) 224-5657
                                                          Fax: (206) 224-5659

1  relating to the expenses to join a HAL vessel or be available for duty for HAL, and records
2  pertaining to the Class members' reimbursement to HAL of these expenses, are maintained by
3  Defendant HAL. The Defendant has, or should have, detailed computerized records of the dates
4  the Plaintiffs worked, including the dates and location of their arrival at the vessels they were
5  employed, as well as the dates and location of their discharge from the vessels of employment. The
6  precise number of Class members can only be obtained through discovery, however the Plaintiff
7  has obtained from public sources the total number of crew upon each vessel at any one time at
8  8,453, and, based upon an industry estimate of thirty percent Filipino crew, estimates there are
9  2,536 seafarers aboard Defendant HAL's vessels as of today and that over 7,500 Filipinos have
10  been effected by Defendant HAL's actions. Plaintiff does not anticipate any difficulties in the
11  management of the action as a class action.

12  **Commonality**

13  26. There are questions of law and fact that are common to the claims of Plaintiffs and the
14  entire Class. Among these common questions are the following:

15        a.    Whether the Defendant has breached the seafarers' POEA Contract of
16        Employment, notably Section 3 of the Standard Terms and Conditions Governing
17        the Employment of Filipino Seafarers On Board Ocean Going Vessels, referenced
18        previously, "FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF
19        EMBARKATION".

20        b. Whether the Defendant has obtained "reimbursements" from its seafarers' wages
21        for Defendant's payment of the seafarers' travel expenses.

22        c. Whether the Defendant paid the balance of wages after the seafarers' discharge
23        from vessels in the United States.

24  27. There are questions of law and fact that are further implicated to the claims of Plaintiff
25  Balen and the U.S ports or harbors subclass beyond the common issues of the entire class. Among

26

COMPLAINT –CLASS ACTION - 7

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

these common questions of the subclass are the following:

a. Whether HAL's retention of wages as reimbursement for travel expenses upon the termination of the voyage in a U.S. port or harbor is a violation of 46 U. S.C. §10313.

b. Whether the seamen are entitled to penalty wages under 46 U.S.C. §10313(g).

**Typicality**

28. Plaintiff's claims are typical of the claims of the Class and/or subclass in that each seafarer is claiming Defendant HAL obtained "reimbursements" from its seafarers' wages for Defendant HAL's payment of the seafarers' travel expenses and failed to pay back the balance of wages after the seafarers' discharge from vessels in the United States.

29. Upon information and belief, there has never been a prior lawsuit certified as a class on behalf of Plaintiff or the Class.

**Adequacy of Representation**

30. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a Class action.

31. To prosecute this case, Plaintiff has engaged the Florida law firms of Toyne & Mayo, P.A., and Downs Brill Whitehead, and the Washington law firm of HarrisMoure pllc – law firms with ample experience in maritime litigation and the legal resources available to effectively represent the Plaintiff in a class action law suit. The Plaintiff will be initially represented before this Honorable Court in this action by Charles P. Moure, Esq., HarrisMoure pllc, 720 Olive Way, Suite 1000, Seattle, WA 98101 charles@harrismoure.com, 206-224-5657 Tel, 206-224-5659 Fax, as local counsel for: (i) Ross B. Toyne, Esq., Toyne & Mayo, P.A., Washington Mutual Bank

COMPLAINT –CLASS ACTION - 8

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone (206) 224-5657
Fax: (206) 224-5659

1  Building, 150 S.E. 2nd Avenue, Suite 1025, Miami, FL 33131, rbtoyne@passengerlaw.com, 305-

2  377-1910 Tel, 305-377-1915 Fax; and (ii) David W. Brill, Esq., dbrill@dbwlaw.com, and Juan M.

3  Garcia, Esq., jgarcia@dbwlaw.com, Downs Brill Whitehead, Mercantile Bank Building, One

4  Southwest 129th Avenue, Suite 305, Pembroke Pines, FL 33027; 954-447-3556 Tel, 954-447-3557

5  Fax. Messrs. Toyne, Brill and Garcia will apply to be admitted *pro hac vice* to this Honorable

6  Court forthwith. These law firms have the financial and legal resources to meet the substantial

7  costs and legal issues associated with this type of litigation.

8  **Requirements of Fed. R. Civ. P. 23(b)(3)**

9  **i. Predominance**

10  32. The questions of law or fact common to the claims of Plaintiff and of each Class

11  member predominate over any questions of law or fact affecting only individual members of the

12  class. All claims by named Plaintiff and unnamed Class members are based on the same alleged

13  "across-the-board" misconduct by Defendant HAL in relation to travel expenses and wages.

14  33. Common issues predominate when, as here, liability can be determined on a class-wide

15  basis, even when there are some individualized damages.

16  34. As a result, when determining whether common questions predominate, courts focus on

17  the liability issue and if the liability issue is common to the class as in the case at bar, common

18  questions are held to predominate over individual questions.

19  35. Since all claims by named Plaintiff and unnamed Class members are based on the same

20  alleged "across-the-board" misconduct by HAL, the predominance requirement of Fed.R.Civ.P.

21  23(b)(3) is satisfied.

22  **ii. Superiority**

23  36. A class action is superior to thousands of individual actions in part because of the non-

24  exhaustive factors listed below:

25      a. It is highly unlikely that individual plaintiffs would shoulder the burden of this

26

COMPLAINT –CLASS ACTION - 9

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1    vast and complex litigation as many are simply too poor or ignorant to bring
2    separate actions.

3        b. There are no known individual Class members who are interested in individually
4    controlling the prosecution of separate actions.

5        c. The interests of justice will be well served by resolving the common disputes of
6    potential Class members in one forum.

7        d. Individual suits would not be cost effective, especially in light of the fact that all
8    of the Class members are foreign nationals.

9        e. A class action is a superior method of seeking relief because certain members of
10   the class fear retaliation from Defendant with respect to their present employment.

11       f. The action is manageable as a class action; individual lawsuits are not
12   economically maintainable as individual actions.

13   37. Federal courts have already determined that in wage claim suits under 46 U.S.C. §
14   10313 involving many potential plaintiffs as in the case at bar, "the class action [pursuant to
15   Fed.R.Civ.P. 23(b)(3)] is not simply the  superior means of resolving the dispute fairly and
16   efficiently but the only means of doing so."

17                                 **V.  COUNT I**

18                    **Breach of the POEA Contract of Employment**

19                               *(The Entire Class)*

20   38. Plaintiff and the class he purports to represent reallege and incorporate by reference
21   paragraphs 1 - 37 of this complaint.

22   39. By reason of the foregoing, Defendant HAL breached Section 3 of the Standard Terms
23   and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels is
24   promulgated by the Philippine Overseas Employment Agency ("POEA") and incorporated by
25   reference in the Plaintiff's standard POEA form Contract of Employment, and as a direct and

26

COMPLAINT –CLASS ACTION - 10

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA  98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1 | proximate result Plaintiff, and the Class he purports to represent, have been deprived their lawful
2 | earned wages and suffered damage.

## VI. COUNT II

### Failure to Pay Wages Under the Seaman's Wage Act, 46 U.S.C. § 10313

*(The U.S. Ports and Harbors Subclass)*

40. Plaintiff and the U.S. ports and harbor subclass he purports to represent reallege and incorporate by reference paragraphs 1 - 37 of this Complaint.

41. Defendant has neglected and refused, and still neglects and refuses, without sufficient cause, to pay Plaintiff, and the Class he purports to represent, upon Plaintiff's and the purported Class members' discharge from Defendant's vessels in a U.S. port or harbor, the wages which Defendant obtained as "reimbursement" for travel expenses.

42. By reason of the foregoing, the Defendant, directly and indirectly, has violated 46 U.S.C. § 10313(f), and Plaintiff and the Class he purports to represent have suffered damages thereby.

43. Pursuant 46 U.S.C. § 10313(g), when payment is not made as provided under 46 U.S.C. § 10313(f) without sufficient cause, the master or owner shall pay to the seaman 2 days wages for each day payment is delayed.

44. As a result of Defendant's conduct, Plaintiff and the Class are entitled to an award of all such wages, interest on the unpaid amounts until the date of judgment, and all amounts due Plaintiff and the Class as penalties under applicable provisions of the 46 U.S.C. §10313(g).

## VII. COUNT III

### Declaration of Rights

*(The Entire Class)*

45. Plaintiff realleges and incorporates by reference paragraphs 1 - 37 of this Complaint.

46. This is an action for declaratory judgment, pursuant to 28 U.S.C. § 2201, with respect

COMPLAINT –CLASS ACTION - 11

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1  to the interpretation and construction of the rights and obligations contained in the POEA contract

2  and Defendant HAL's Terms of Employment.

3      47.  Pursuant to Section 3 of the POEA Contract entitled, "FREE PASSAGE FROM THE

4  POINT OF HIRE TO THE PORT OF EMBARKATION", the Contract provides:

5

6          The seafarer shall join the vessel or be available for duty at the date and time
           specified by the employer.  The seafarer shall travel by air or as otherwise
7          directed at the expense of the employer.

8      48.  Pursuant to the POEA Contract, Defendant HAL, and not its Filipino employees,

9  appears plainly obligated to bear the expense of transporting Plaintiff and the purported class to the

10  point of embarkation.

11     49.  Notwithstanding its apparent contractual obligation, Defendant deducted and continues

12  to deduct the wages of its employees in order to recoup the expense of transportation.

13     50.  Plaintiff and the purported class are uncertain as to their rights pursuant to the POEA

14  contract, the Terms of Employment and applicable law.

15     51.  Plaintiff and the purported class are in need of the present declaration of rights under

16  the subject contracts and law.

17     52.  The Plaintiff's and the purported class' right to recovery is dependent upon this Court's

18  finding of facts and/or application of law.

19     53.  Defendant's interest in this declaration of rights is actual, present, adverse and

20  antagonistic in fact and/or law to Plaintiff's and the class' interest.

21     54.  Plaintiff and the purported class seek relief in order to enforce contractual and/or legal

22  rights, not to merely seek legal advice from this Honorable Court.

23  //

24  //

25  //

26

COMPLAINT –CLASS ACTION - 12

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax  (206) 224-5659

# VIII. RELIEF REQUESTED

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the Class, respectfully requests that this Court:

A.   Certify this action as a class action under Federal Rule of Civil Procedure 23.

B.   Declare that the Defendant HAL breached the seafarers' POEA Contract of Employment, notably Section 3 of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels, referenced previously, "FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION".

C.   Declare that Defendant HAL's "reimbursement" scheme violates the Wage Act, 46 U.S.C. § 10313.

D.   Declare that Defendant HAL's wage deductions were done without sufficient cause.

E.   Award Plaintiff and the Class damages for the deducted and unpaid compensation, including penalty wages and pre-judgment interest on these amounts.

F.   Award Plaintiff and the Class their attorneys' fees, costs and expenses.

G.   Award Plaintiff and the Class such further relief as is appropriate in the interests of justice.

H.   Enjoin Defendant from further obtaining the "deployment cost-reimbursement" from the Plaintiff and/or the Class.  Furthermore, if Plaintiff's allegations are proven to be true, enjoin Defendant from: harassing Plaintiff and the Class; from discharging any member of the Class in retaliation for making a claim in this litigation; and/or from taking any action to limit their future employability.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which a trial by jury is permitted.

COMPLAINT –CLASS ACTION - 13

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax: (206) 224-5659

1

2
      DATED this 27th day of April, 2007.

3
                           HARRIS & MOURE, pllc

4

5
                           By

6
                           Charles P. Moure, WSBA #23701

7
                           Counsel for the Plaintiff

                           720 Olive Way, Suite 1000

8
                           Seattle, WA 98101

                           charles@harrismoure.com

9
                           (206) 224-5657 (Telephone)

                           (206) 224-5659 (Fax)

10
Of Counsel for the Plaintiff

11

Ross B. Toyne

12
TOYNE & MAYO, P.A.

Washington Mutual Bank Building

13
150 SE 2nd Avenue, Suite 1025

14
Miami, FL 33131

rbtoyne@passengerlaw.com

15
(305) 377-1910 (Telephone)

(305) 377-1915 (Fax)

16

17
Of Counsel for the Plaintiff

18
David W. Brill

19
Juan M. Garcia

DOWNS BRILL WHITEHEAD

20
Mercantile Bank Building

One Southwest 129th Avenue, Suite 305

21
Pembroke Pines, FL 33027

dbrill@dbwlaw.com

22
jgarcia@dbwlaw.com

23
(954) 447-3556 (Telephone)

(954) 447-3557 (Fax)

24

25

26
COMPLAINT –CLASS ACTION - 14

**Harris & Moure**
*A Professional Limited Liability Corporation*
720 Olive Way, Suite 1000
Seattle, WA 98101
Phone: (206) 224-5657
Fax. (206) 224-5659

Romeo Balen v. Holland America Line Inc.

Index of Composite Exhibit Attached to Class Action Complaint

1. Plaintiff's Contract of Employment
2. Exemplar of Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean Going Vessels
   a. Section 3 states: "FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION   The seafarer shall join the vessel or be available for duty at the date and time specified by the employer.   The seafarer shall travel by air or as otherwise directed **at the expense of the employer.**"
3. Holland America Line Inc. Performance Improvement Notice, March 2, 2006
4. Holland America Line Inc. Performance Improvement Notice, March 3, 2006
5. Advance Reimbursement Re-Payment Statements for Plaintiff, December 6, 2005; January 30, 2006, February 7, 2006 with January 12, 2006, letter from Christina Hulscher, Paymaster, M/V Westerdam; February 17, 2006; February 23, 2006; and March 3, 2006
6. HAL Document entitled "Questions and Answers Beverage Service Charge Plan"
   a. Page 4 states:   "**The Purser will give you your entire pay.   You will be required to hand back to the Purser your reimbursement amount.**"
7. HAL Document entitled "Explanation deployment costs"
   a. Page 1 states:   "Filipino and Indonesian crew needs to pay the deployment costs separate from their wages.   **This is in accordance with a new American law that prohibits employers from deducting such costs directly.**"
8. HAL Email dated May 27, 2004 entitled "RE: Deployment Costs"
9. HAL Document dated February 10, 2004, entitled "LETTER FOR ALL BEVERAGE STAFF"   from Mr. Stein Kruse, President and Chief Operating Officer, Holland America Line Inc., referencing "Reimbursement Amount"
10. Excerpts from "Handouts of HAL POLICIES & PROCEDURES", pages 12 and 13, documenting HAL's determination that Filipino culture is one of acquiescence, non confrontation and racial inferiority.

**COMPLAINT---CLASS ACTION**

# EXHIBIT 1

Republic of the Philippines
Department of Labor and Employment
Philippine Overseas Employment Administration

## CONTRACT OF EMPLOYMENT

**KNOW ALL MEN BY THESE PRESENTS:**

This Contract, entered into voluntarily by and between:

Name of Seafarer _____ ROMEO E. BALEN _____

Address _____ 1346 ALMEDA ST. TAYUMAN, MANILA _____

SIRB No. _____ A566024 _____ SRC No. _____ 0014350-93 _____

License No. _____

hereinafter referred to as the Employee

and

Name of Agent _____ UNITED PHILIPPINE LINES, INC. _____

For and behalf of _____ HOLLAND AMERICA LINE, INC. _____
(Principal/Country).

for the following vessel:

Name of Vessel _____ MS WESTERDAM _____

Official Number _____ Gross Registered Tonnage (GRT) _____ 32000 _____

Flag _____ DUTCH _____ Year Built: _____ 2003 _____ Classification Society: _____

hereinafter referred to as Employer

## WITNESSETH

1. That the employee shall be employed on board under the following terms and conditions:

   1.1 Duration of Contract: _____ 12 MONTHS _____

   1.2 Position: _____ GFA SERVICE AREA _____

   1.3 Basic Monthly Salary: _____ $442.00 (INCLUSIVE OF OVERTIME, VACATION, ALLOWANCES) OR ANNUAL GUARANTEED PAY OF $5,995.10 _____

   1.4 Hours of Work: _____ 77 hrs/wk. _____

   1.5 Overtime: _____ $1.67 ot/hr. in excess of 77 hrs/wk. _____

   1.6 Vacation Leave with Pay: _____

   1.7 Point of Hire: _____ MANILA _____

2. The herein terms and conditions in accordance with Department Order No. 4 and Memorandum Circular No. 9, both Series of 2000, shall be strictly and faithfully observed.

3. Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed and approved by the Philippine Overseas Employment Administration (POEA). Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels.

4. Violations of the terms and conditions of this Contract with its approved addendum shall be a ground for disciplinary action against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this _____ 19th _____ day of _____ SEPTEMBER _____ 20 _05_ at _____ UPL/MANILA _____ , Philippines.

_____
Seafarer

_____ JOSE GERONIMO S. CONSUNJI _____
For the Employer

Verified and approved by the POEA:

Department of Labor and Employment
Philippine Overseas Employment Administration
Employment Contract Approved By:

_____ SEP 2 0 2005

_____
Date

Signature of POEA Official

# EXHIBIT 2

# STANDARD TERMS AND CONDITIONS
# GOVERNING THE EMPLOYMENT OF FILIPINO SEAFARERS
# ON-BOARD OCEAN-GOING VESSELS

**Definition of Terms:**

For purposes of this contract, the following terms are defined as follows:

1. **Point of Hire** - refers to the place indicated in the contract of employment which shall be the basis for determining commencement and termination of contract.
2. **Convenient Port** - any port where it is practicable, economical, safe and convenient to repatriate the seafarer.
3. **Philippine Port** - refers to any Philippine airport or seaport.
4. **Basic Wage** - refers to the salary of the seafarer exclusive of overtime, leave pay and other bonuses.
5. **Departure** - refers to the actual departure from the point of hire of the seafarer through air, sea or land travel transport to join his vessel to a Philippine or foreign port.
6. **Regular Working Hours** - refers to the seafarer's eight (8) hour working hours within the period of 24 hours.
7. **Dental Treatment** - covers tooth extraction or dental surgery, if necessary, due to accident.
8. **Shipwreck** - refers to the damage or destruction of a vessel as was caused by collision, storm, grounding or any other marine peril at sea or in port rendering the vessel absolutely unnavigable or unable to pursue her voyage.
9. **Compassionate Ground** - refers to sickness of death of an immediate member of the seafarer's family which includes his parents, spouse and children if the seafarer is married or his parents if the seafarer is single.
10. **Principal** - any person, partnership or corporation hiring Filipino seafarers to work onboard ocean-going vessels.
11. **Work-Related Injury** - injury/ies resulting in disability or death arising out of and in the course of employment.
12. **Work-Related Illness** - any sickness resulting to disability or death as a result of an occupational disease listed under Section 32 A of this Contract with the conditions set therein satisfied.

## SECTION 1. DUTIES

**A. Duties of the Employer/Agency/Master:**

1. To faithfully comply with the stipulated terms and conditions of this contract, particularly the prompt payment of wages, remittance of allotment and the expeditious settlement of valid claims of the seafarer.
2. To make operational on board the vessel the grievance machinery provided in this contract and ensure its free access at all times by the seafarer.
3. To provide a seaworthy vessel for the seafarer and take all reasonable precautions to prevent accident and injury to the crew including provision of safety equipment, fire prevention, safe and proper navigation of the vessel and such other precautions necessary to avoid accident, injury or sickness to the seafarer.
4. To observe the Code of Ethics for Seafarer and conduct himself in the traditional decorum of a master.

**B. Duties of the Seafarer:**

1. To faithfully comply with and observe the terms and conditions of this contract, violation of which shall be subject to disciplinary action pursuant to Section 33 of this contract.
2. To abide by the Code of Discipline as provided in the POEA rules and regulations governing overseas contract workers and the Code of Ethics for seafarers;
3. To be constant to the lawful commands of the Master or any person who shall lawfully succeed him and to comply with company policy including safety policy and procedures and any instructions given in connection therewith.
4. To be diligent in his duties relating to the vessel, his stores and cargo, whether on board, in boats or ashore; and
5. To conduct himself in an orderly and respectful manner towards passengers and shippers stevedores, port authorities and other persons on official business with the ship.

## SECTION 2. COMMENCEMENT/DURATION OF CONTRACT

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.

B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to the mutual consent of both parties.

## SECTION 3. FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION

The seafarer shall join the vessel or be available for duty at the date and time specified by the employer. The seafarer shall travel by air or as otherwise directed at the expense of the employer.

## SECTION 4. BAGGAGE ALLOWANCE

The seafarer travelling by air to join a vessel or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines. The cost of the excess baggage shall be for the account of the seafarer.

## SECTION 5. HYGIENE AND VACCINATION

A. The seafarer shall keep his quarters and other living spaces such as messrooms, toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master. The work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.

B. The seafarer shall submit to the order of the master or to the laws of any country within the territorial jurisdiction of which the vessel may enter to have such vaccination or inoculation or to undertake such other safeguarding his health and of the whole crew.

## SECTION 6. WAGES

A. The seafarer shall be paid his monthly wages not later than 15 days of the succeeding month from the date of the commencement of the contract until the date of arrival at point of hire upon termination of his employment pursuant to Section 18 of this Contract.

## SECTION 7. PAYMENT ON BOARD

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment. Advances shall be at the master's employer's discretion and in accordance with the foregoing conditions.

## SECTION 8. ALLOTMENTS AND REMITTANCES

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank. The master/employer/agency shall provide the seafarer with facilities to do so at no expense to the seafarer. The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary including backwages, if any.

---

B. The master/employer/agency shall also provide facilities to the seafarer to remit any amount earned in excess of his allotment to his designated allottee in the Philippines through any authorized Philippine bank without any charge to him.

C. The allotments shall be paid to the designated allottee in Philippine currency at the rate of exchange indicated in the credit advise of the local authorized Philippine bank.

## SECTION 9. ACCOUNT OF WAGES & CERTIFICATE OF EMPLOYMENT

The seafarer, upon his discharge, shall be given a written account of his wages reflecting all deductions therefrom, where a seafarer is landed in an emergency, the written account of his wages shall be given to him as soon as practicable thereafter. Upon the seafarer's request, he shall also be provided by his employer/agency his certificate of employment on service record without any charge.

## SECTION 10. HOURS OF WORK

A. The seafarer shall perform not more than forty-eight (48) hours of regular work a week. The hours of work shall be determined and prescribed by the master, provided that in conformity with customary international practices and standards are so prescribed in paragraph B below.

B. Regular working hours for the seafarer shall be eight (8) hours in every 24 hours, or/eight to midnight, Monday to Sunday. The normal practice is as follows:
   1. The day worker shall observe the eight (8) regular working hours during the period from 0800 hours to 1800 hours.
   2. The steward personnel shall observe the eight (8) regular working hours during the period from 0500 hours to 2100 hours.
   3. The Radio Operator shall observe the eight (8) regular working hours in every twenty-four (24) hours, midnight to midnight, from Monday to Sunday as established by International Telecommunication Conventions and as prescribed by the master.
   4. For those who are on sea watch, their working hours shall be eight (8) hours per day. Staggering of working hours will be at the master's discretion.

C. The seafarer shall be allowed reasonable rest period in accordance with international standards.

## SECTION 11. OVERTIME & HOLIDAYS

A. The seafarer shall be compensated for all work performed in excess of the regular eight (8) hours as prescribed above. Overtime pay may be classified as open, fixed or guaranteed.
   In computing overtime, a fraction of the first hour worked shall be considered as one full hour. After the first hour overtime, any work performed which is less than thirty (30) minutes shall be considered as half an hour and more than thirty (30) minutes shall be considered one full hour.

B. Overtime work may be compensated at the following rates:
   1. Open overtime - not less than 125 percent (125%) of the basic hourly rate computed based on two hundred eight (208) regular working hours per month.
   2. Guaranteed or fixed overtime - not less than thirty percent (30%) of the basic monthly salary of the seafarer This fixed rate overtime shall include overtime work performed on Sundays and holidays but shall not exceed one hundred five (105) hours a month.
   3. Overtime work for officers shall be computed based on the fixed overtime rate.
   4. For ratings, overtime work shall be based on guaranteed or open overtime rate, as mutually agreed upon by the contracting parties. Overtime work in excess of 105 hours a month for ratings shall be further compensated at the open overtime rate.

C. Any hours of work or duty including hours of watchkeeping performed by the seafarer on designated rest days and holidays shall be paid rest day or holiday pay. The following shall be considered as holidays at sea and in port:

   New Year's Day - January 1
   Maundy Thursday - movable date
   Good Friday - movable date
   Araw ng Kagitingan (Bataan & Corregidor Day) - April 9
   Labor Day - May 1
   Independence Day - June 12
   National Heroes Day - Last Sunday of August
   All Saints Day - November 1
   Bonifacio Day - November 30
   Christmas Day - December 25
   Rizal Day - December 30

D. Emergency Duty - No overtime work shall be considered for any work performed in case of emergency affecting the safety of the vessel, passenger, crew or cargo, of which the master shall be the sole judge, or for fire, boat, or emergency drill or work required to give assistance to other vessels or persons in immediate peril.

## SECTION 12. LEAVE PAY

The seafarer's leave pay shall be in accordance with the number of days leave per month as agreed upon. Days leave shall not be less than two and a half (2-1/2) days for each month of service and pro-rated. Leave pay shall be withheld onboard or settled within two weeks after arrival of the seafarer at the point of hire.

## SECTION 13. SHORE LEAVE

The seafarer shall be allowed shore leave when practicable, upon the consent of the master or his deputy, taking into consideration the operations and safety of the vessel.

## SECTION 14. VICTUALLING, VESSEL STORES AND PROVISIONS

A. The seafarer shall be provided by the manned employer with substances consistent with good maritime standards and practices while on board the vessel.

B. All stores and provisions issued to the seafarer are only for use and consumption on board the vessel and are owned or unconsumed stores or provisions shall remain the property of the employer. The seafarer shall not take ashore, sell, destroy or give away such stores and provisions.

## SECTION 15. TRANSFER CLAUSE

The seafarer agrees to be transferred at any port to any vessel owned or operated, manned or managed by the same employer, provided it is accredited to the same manning agent and provided further that the position on the seafarer and the rate of his wages and terms of service are in no way inferior and the total period of employment shall not exceed that originally agreed upon.

Any form of transfer shall be documented and made available when necessary.

## SECTION 16. GRIEVANCE MACHINERY

A. If the seafarer considers himself aggrieved, he shall make his complaint in accordance with the following procedures:
   1. The seafarer shall first approach the head of the Department in which he is assigned to explain his grievance.
      a. In the Deck, Radio and Catering Department, the head is the Chief-mate.

1

**SECTION 17. DISCIPLINARY PROCEDURES**

**SECTION 18. TERMINATION OF EMPLOYMENT**

**SECTION 19. REPATRIATION**

**SECTION 20. COMPENSATION AND BENEFITS**

A. COMPENSATION AND BENEFITS FOR DEATH:

B. COMPENSATION AND BENEFITS FOR INJURY OR ILLNESS:

**SECTION 21. WAR AND WARLIKE OPERATIONS ALLOWANCE**

2

**SECTION 22. TERMINATION DUE TO SHIPWRECK**

Where the Vessel is wrecked necessitating the termination of employment before the date indicated in the contract, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at employer's cost and one month basic wage as termination pay.

**SECTION 23. TERMINATION DUE TO VESSEL SALE, LAY-UP OR DISCONTINUANCE OF VOYAGE**

Where the vessel is sold, laid up, or the voyage is discontinued necessitating the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's cost and one (1) month basic wage as termination pay, unless arrangements have been made for the seafarer to join another vessel belonging to the same principal to complete his contract in which case the seafarer shall be entitled to basic wages until the date of joining the other vessel.

**SECTION 24. TERMINATION DUE TO UNSEAWORTHINESS**

A.   If the vessel is declared unseaworthy by a classification society, port state or flag state, the seafarer shall not be forced to sail with the vessel.

B.   If the vessel's unseaworthiness necessitates the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at cost to the employer and termination pay equivalent to one (1) month basic wage.

**SECTION 25. TERMINATION DUE TO REGULATION 1/4, CONTROL PROCEDURES, OF THE 1978 STCW CONVENTION, AS AMENDED**

If the seafarer is terminated and repatriated as a result of port state control procedure/action in compliance with Regulation 1/4 of the 1978 STCW Convention, As Amended, his termination shall be considered valid. However, he shall be entitled to repatriation, earned wages and other benefits.

**SECTION 26. CHANGE OF PRINCIPAL**

A.   Where there is a change of principal of the vessel necessitating the termination of employment of the seafarer before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's expense and one month basic pay as termination pay.

B.   If by mutual agreement, the seafarer continues his service on board the same vessel, such seafarer shall be treated as a new contract. The seafarer shall be entitled to earned wages only.

C.   In case arrangements have been made for the seafarer to join another vessel to complete his contract, the seafarer shall be entitled to basic wage until the date of joining the other vessel.

**SECTION 27. LOSS OF OR DAMAGE TO CREW'S EFFECTS BY MARINE PERIL**

A.   The seafarer shall be reimbursed by the employer the full amount of loss or damage to his personal effects but in no case shall the amount exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$ 2,000) if his personal effects are lost or damaged as a result of the wreck or loss or standing or abandonment of the vessel or as a result of fire, flooding, collision or piracy.

B.   In case of partial loss, the amount shall be determined by mutual agreement of both parties but in no case to exceed the Philippine currency equivalent to Two Thousand US dollars (US$2,000).

C.   Reimbursement for loss or damage to the seafarer's personal effects shall not apply if such loss or damage is due to (a) the seafarer's own fault; (b) larceny or theft; or (c) robbery.

D.   Payment of any reimbursement shall be computed at the rate of exchange prevailing at the time of payment.

**SECTION 28. GENERAL SAFETY**

A.   The seafarer shall observe and follow any regulation or regulation that the master may impose concerning safety, drug and alcohol and environmental pollution.

B.   The seafarer shall make use of all appropriate safety equipment provided him and must ensure that it is suitably derated from the safety point of view for the job at hand.

**SECTION 29. DISPUTE SETTLEMENT PROCEDURES**

In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If the parties are not covered by a collective bargaining agreement, the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 8042, otherwise known as the Migrant Workers and Overseas Filipinos Act of 1995 or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators. If there is no provision as to the voluntary arbitrators to be appointed by the parties, the same shall be appointed from the accredited voluntary arbitrators of the National Conciliation and Mediation Board of the Department of Labor and Employment.

The Philippine Overseas Employment Administration (POEA) shall exercise original and exclusive jurisdiction to hear and decide disciplinary action on cases, which are administrative in character, involving or arising out of violations of recruitment laws, rules and regulations involving employers, principals, contracting partners and Filipino seafarers.

**SECTION 30. PRESCRIPTION OF ACTION**

All claims arising from this contract shall be made within three (3) years from the date of the cause of action arose; otherwise the same shall be barred.

**SECTION 31. APPLICABLE LAW**

Any unresolved dispute, claim or grievance arising out of or in connection with this contract, including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants where the Philippines is a signatory.

**SECTION 32. SCHEDULE OF DISABILITY OR IMPEDIMENT FOR INJURIES SUFFERED AND DISEASES INCLUDING OCCUPATIONAL DISEASES OR ILLNESS CONTRACTED.**

**HEAD** ......

Traumatic head injuries that result in:

1. Aphasia with inability to communicate even over three (3) inches without brain injury ...... Gr. 3
2. Aphasia unfitted with brain over three (3) inches without brain injury ...... Gr. 3
3. Severe paralysis of both upper or lower extremities or one upper and one lower extremity ...... Gr. 1
4. Moderate paralysis of two (2) extremities producing moderate difficulty in movements with self-care activities ...... Gr. 6
5. Slight paralysis affecting one extremity producing slight difficulty with self-care activities ...... Gr. 10
6. Severe mental disorder or Severe Complex Cerebral function disturbance or post-traumatic psychoneurosis which require regular and full attendance or aid or another worker-permanently unable to resume any work ...... Gr. 1
7. Moderate mental disorder or moderate brain functional disturbance which limits worker to the activities of daily living with some directed care or attendance ...... Gr. 6
8. Slight mental disorder or disturbance that requires little attendance or aid and which interferes to a slight degree with his working capacity of the claimant ...... Gr. 10
9. Incurable imbecility ...... Gr. 1

**FACE**

1. Severe disfigurement of the face or head so as to make the worker so repulsive as to greatly handicap him in securing or retaining employment, thereby being so deformed functional disorder ...... Gr. 3
2. Moderate facial disfigurement involving partial ablation of the nose with big scars in face or head ...... Gr. 5
3. Partial ablation of the nose or partial avulsion of the scalp ...... Gr. 9
4. Complete loss of the sense of masticate and speech function ...... Gr. 5
5. Moderate constriction of the jaw resulting in moderate degree of difficulty in chewing and moderate loss of the power or the articulation of speech ...... Gr. 9
6. Slight atrophic deformation and speech function due to fracture injuries to jaw or cheek bone ...... Gr. 12

**EYES**

1. Blindness or total and permanent loss of vision of both eyes ...... Gr. 1
2. Total blindness of one (1) eye and 50% percent (50%) loss of vision of the other eye ...... Gr. 5
3. Loss of one eye or total blindness of one eye ...... Gr. 7
4. Fifty percent (50%) loss of vision of one eye ...... Gr. 10
5. Lagophthalmos, one eye ...... Gr. 12
6. Ectropion, one eye ...... Gr. 12
7. Entropion, one eye ...... Gr. 12
8. Ptosis, one eye ...... Gr. 12

NOTE: Snellen's Chart should be made for near and distant vision.

**NOSE AND MOUTH**

1. Complete loss/ablation of the nose (both sides) hindering breathing ...... Gr. 13
2. Loss of the sense of hearing in one ear ...... Gr. 12
3. Injuries to the nose (partial amputation to adhesion) or palate causing defective speech ...... Gr. 10
4. Loss of teeth (3) teeth restored by prosthesis ...... Gr. 14

**EARS**

1. For the complete loss of the sense of hearing on both ears ...... Gr. 3
2. Loss of two (2) external ears ...... Gr. 8
3. Complete loss of the sense of hearing in one ear ...... Gr. 11
4. Loss of one external ear ...... Gr. 12
5. Loss of one half (1/2) of an external ear ...... Gr. 14

**NECK**

1. Such injury to the throat as necessitates the wearing of a tracheal tube ...... Gr. 6
2. Loss of speech due to injury to the vocal cord ...... Gr. 8
3. Total stiffness of neck due to fracture or dislocation of the cervical spine ...... Gr. 8
4. Moderate stiffness of two-thirds (2/3) loss of motion of the neck ...... Gr. 10
5. Slight stiffness of neck or one third (1/3) loss of motion ...... Gr. 12

**CHEST TRUNK SPINE**

1. Fracture of four (4) or more ribs resulting in severe limitation of chest expansion ...... Gr. 6
2. Fracture of four (4) or more ribs with intractable marginal resulting in moderate reduction of chest expansion ...... Gr. 8
3. Slight limitation of chest expansion due to simple rib fracture without intractable marginal ...... Gr. 12
4. Fracture of the dorsal or lumbar spines resulting to severe or total rigidity of the trunk or total loss of lifting power of heavy weight ...... Gr. 6
5. Moderate rigidity or two-thirds (2/3) loss of motion or lifting power of the trunk ...... Gr. 8
6. Slight rigidity or one-third (1/3) loss of motion or lifting power of the trunk ...... Gr. 11
7. Injury to the spinal cord as to make walking impossible without the aid of a pair of crutches ...... Gr. 4
8. Injury to the spinal cord as to make walking impossible even with the aid of a pair of crutches ...... Gr. 1
9. Injury to the spinal cord resulting in incontinence of urine and feces ...... Gr. 1

**ABDOMEN**

1. Loss of the spleen ...... Gr. 8
2. Loss of one kidney ...... Gr. 7
3. Severe residuals of impairment of intra-abdominal organs which require regular aid and attendance that will enable worker at least any gainful employment ...... Gr. 1
4. Moderate residuals of disorder of the intra-abdominal organs secondary to trauma resulting to impairment of nutrition, moderate tenderness, nausea, vomiting, constipation or diarrhea ...... Gr. 7
5. Slight residuals or disorder of the intra-abdominal organs resulting in impairment of nutrition, slight tenderness and/or constipation or diarrhea ...... Gr. 10
6. Inguinal hernia secondary to trauma or strain ...... Gr. 12

**PELVIS**

1. Fracture of the pelvic rings so as totally incapacitate worker to work ...... Gr. 3
2. Fracture of the pelvis resulting into deformity and tenderness ...... Gr. 9

**URINARY AND GENERATIVE ORGANS**

1. Total loss of penis ...... Gr. 3
2. Total loss of both testicles ...... Gr. 5
3. Total loss of one testicle ...... Gr. 11
4. Scars on the penis or obstruction of the canals of the caverneus body or urethra interfering with urine excretion reaching critical ...... Gr. 9
5. Loss of one breast ...... Gr. 10
6. Prolapse of the uterus ...... Gr. 12
7. Gross difficulty in urinating ...... Gr. 12
8. Incontinence of urine ...... Gr. 12

**THUMBS AND FINGERS**

1. Total loss of one thumb including metacarpal bone ...... Gr. 9
2. Total loss of one thumb ...... Gr. 10
3. Total loss of one index finger including metacarpal bone ...... Gr. 10

21

4   Total loss of one index finger ................................................. Gr. 11
5   Total loss of one middle finger including metacarpal bone ......... Gr. 12
6   Total loss of one ring the finger ............................................ Gr. 12
7   Total loss of one ring finger including metacarpal bone ............ Gr. 12
8   Total loss of one ring finger .................................................. Gr. 13
9   Total loss of one small finger including metacarpal bone .......... Gr. 13
10  Total loss of one small finger ................................................ Gr. 13
11  Loss of two (2) or more fingers: Compensation for the loss or loss of use of two (2) or more fingers or one (1) or more phalanges of two or more digits of a hand must be proportioned to the loss of the hand occasioned thereby but shall not exceed the compensation for the loss of a hand

      a.  ... Loss of five (5) fingers of one hand ......................... Gr. 8
      b.  ... Loss of thumb, index fingers and any of 2 or more
            fingers of his same hand ................................................ Gr. 8
      c.  ... Loss of the thumb, index finger and any one of the
            remaining fingers of the same hand ............................... Gr. 7
      d.  ... Loss of thumb and index finger ................................ Gr. 8
      e.  ... Loss of three (3) fingers of one hand not including
            thumb and index finger ................................................. Gr. 9
      f.  ... Loss of the index finger and any one of the other
            fingers of the same hand excluding thumb ...................... Gr. 9
      g.  ... Loss of two (2) digits of one hand not including thumb
            and index finger ........................................................... Gr. 10

12  Loss of ten (10) fingers of both hand ....................................... Gr. 3

**HANDS**

1   Total loss of use of both hands or amputation of both hands at wrist joints or above .... Gr. 1
2   Amputation of a hand at carpo-metacarpal joint .............................. Gr. 9
3   Amputation between wrist and elbow joint ...................................... Gr. 9
4   Loss of grasping power for small objects between the fold of the finger of one hand ... Gr. 10
5   Loss of grasping power for large objects between fingers and palm of one hand ......... Gr. 9
6   Loss of opposition between the thumb and tips of the fingers of one hand ............... Gr. 9
7   Ankylosed wrist in normal position .............................................. Gr. 11
8   Ankylosed wrist in position one third (1/3) flexed or half extended and flexion limited
    motion of a wrist ...................................................................... Gr. 11

**SHOULDER AND ARM**

1   Inability to turn forearm (forearm in normal position supination) ........ Gr. 11
2   Inability to turn forearm (forearm in abnormal position-pronation) ...... Gr. 11
3   Disturbance of the normal carrying angle or weakness of an arm or a forearm due to deformity of moderate atrophy of muscles ........... Gr. 11
4   Stiff elbow in full flexion or extension lines sided ......................... Gr. 9
5   Stiff elbow at right angle flexion .................................................. Gr. 9
6   Flail elbow joint ........................................................................ Gr. 8
7   Pseudoarthrosis of the humerus with psycological or nodal paralysis .... Gr. 8
8   Ankylosis of one (1) shoulder, the shoulder blade remaining mobile ...... Gr. 9
9   Ankylosis of one shoulder, the shoulder blade remaining rigid ............ Gr. 8
10  Unreduced dislocation of one (1) shoulder .................................... Gr. 9
11  Ruptured biceps or pseudoarthrosis of the humerus, class (one side) .... Gr. 9
12  Inability to raise arm more than halfway from horizontal to perpendicular .... Gr. 10
13  Ankylosis of the shoulder joint not permitting arm to be raised above a level with a shoulder and a productive fracture or faulty union collar bone ............ Gr. 10
14  Total paralysis of both upper extremities ..................................... Gr. 1
15  Total paralysis of one upper extremity ......................................... Gr. 6
16  Amputation of one (1) upper extremity at or above the elbow ............. Gr. 6
17  Scar the skin of the palm in one extremity ................................... Gr. 14

**LOWER EXTREMITIES**

1   Loss of a hip bone ..................................................................... Gr. 12
2   Loss of a leg other from the big one .......................................... Gr. 12
3   Loss of two (2) digits of both feet ............................................ Gr. 12
4   Loss of a great toe of one foot - one side .................................. Gr. 12
5   Loss of two toes not including great toe in toe next to it ............... Gr. 12
6   Loss of three (3) toes including great toe of a foot ....................... Gr. 11
7   Loss of foot (4), excluding great toe of a foot ............................. Gr. 11
8   Loss of great toe and two (2) other toes of the same foot ............... Gr. 9
9   Loss of the digits of a foot ........................................................ Gr. 9
10  Loss of both feet at ankle joint or above .................................... Gr. 1
11  Loss of one foot at ankle joint or above ...................................... Gr. 6
12  Depression of the arch of a foot resulting in weak feet .................. Gr. 12
13  Loss of one half (1/2) metatarsals of heel (1/2 foot) ..................... Gr. 11
14  Loss of whole metatarsus or transport of feet ............................. Gr. 11
15  Tearing of achilles tendon resulting in the impairment of active flexion and extension of a foot ....... Gr. 12
16  Mileolar fracture with displacement of the foot inward or outward .... Gr. 12
17  Complete immobility of an ankle joint in abnormal position ............. Gr. 10
18  Complete immobility of an ankle joint in normal position ................ Gr. 11
19  Total loss of a leg or amputation at or above the knee ................... Gr. 6
20  Stretching ing of the ligaments of a knee resulting in instability of the joint .... Gr. 10
21  Ankylosis of a knee in complete extension of varum ....................... Gr. 10
22  Pseudoarthrosis of a knee cap ................................................... Gr. 12
23  Complete immobility of a knee joint in full extension .................... Gr. 10
24  Complete immobility of a knee joint in strong flexion .................... Gr. 7
25  Complete immobility of a leg joint in flexion at the thigh ............... Gr. 5
26  Complete immobility of a hip joint in full extension of the thigh ...... Gr. 5
27  Slight atrophy of calf of leg muscles without apparent shortening of joint lesions of disturbance of weight-bearing line .... Gr. 13
28  Shortening of a lower extremity from pelvis to heel culminating with slight pain index or disturbance of weight-bearing joint ...... Gr. 12
29  Shortening of 3 to 6 cm. with slight atrophy of calf or thigh muscles .... Gr. 12
30  Shortening of 3 to 6 cm. with either joint lesion or disturbance of weight-bearing joint .... Gr. 11
31  Irregular union of fracture with joint stiffness and with shortening of 6 to 8 cm. producing permanent lameness .... Gr. 10
32  Irregular union of fracture in a thigh or leg with shortening of 6 to 8 cm .... Gr. 10
33  Failure of fracture of both hips to unite ....................................... Gr. 7
34  Failure of fracture of a hip to unite ............................................. Gr. 9
35  Paralysis of both lower extremities ............................................. Gr. 1
36  Paralysis of one lower extremity ................................................. Gr. 6
37  Scar the area of a palm or larger left on an extremity .................... Gr. 14

NOTE: Any item in the schedule classified under Grade 1 shall be considered or shall constitute total and permanent disability.

**SCHEDULE OF DISABILITY ALLOWANCES**

| Impediment Grade: | | | Impediment |
|---|---|---|---|
| 1 | US$50,000 | | 120.00% |
| 2 | | | 88.81% |
| 3 | | | 78.36% |
| 4 | | | 68.66% |
| 5 | | | 58.96% |
| 6 | | | 50.00% |
| 7 | | | 41.80% |
| 8 | | | 33.59% |
| 9 | | | 26.12% |
| 10 | | | 20.15% |
| 11 | | | 14.93% |
| 12 | | | 10.45% |
| 13 | | | 6.72% |
| 14 | | | 3.74% |

To be paid in Philippine Currency equivalent at the exchange rate prevailing during the time of payment.

**SECTION 32-A OCCUPATIONAL DISEASES**

For an occupational disease and the resulting disability or death to be compensable, all of the following conditions must be satisfied:

1   The seafarer's work must involve the risk described herein;
2   The disease was contracted as a result of the seafarer's exposure to the described risks;
3   The disease was contracted within a period of exposure and under such other factors necessary to contract it;
4   There was no notorious negligence on the part of the seafarer.

The following diseases are considered as occupational when contracted under working conditions involving the risks described herein:

| OCCUPATIONAL DISEASES | NATURE OF EMPLOYMENT |
|---|---|
| 1   Cancer of the epithelial lining of the bladder (Papilloma of the bladder) | Work involving exposure to alpha-naphthylamine, beta-naphthylamine or benzidine or any part of the salts and cenamide of magenta. |
| 2   Cancer, epitheliomatous or ulceration of the skin or of the corneal surface of the eye due to tar, pitch, bitumen, mineral oil or paraffin, or compound product or residue of these substances. | The use or handling of, exposure to tar, pitch, bitumen, mineral oil (including paraffin) soot or any compound product or residue of any of these substances. |
| 3   Deafness | Any industrial operation having excessive noise particularly in the higher frequencies. |
| 4   Decompression sickness
      a.  Caisson disease
      b.  Aeroembolism | Any process carried on in compressed or rarefied air. Any process carried on in rarefied air. |
| 5   Dermatitis due to irritants and sensitizers | The use or handling of chemical agents which are skin irritants and sensitizers. |
| 6   Infection (Brucellosis) | Any occupation involving the handling of contaminated food and drink particularly milk, butter and cheese of infected goats and cows. |
| 7   Ionizing radiation disease, inflammation, ulceration or malignant disease of skin or subcutaneous tissues of the bones or leukemia, or anemia of the aplastic type due to X-rays, ionizing particles, radium or radioactive substances. | Exposure to X-rays, ionizing particles of radium or other radioactive substances or other forms of radiant energy. |
| 8   Poisoning and its sequelae caused by:
      a.  Ammonia
      b.  Arsenic or its toxic compounds
      c.  Benzene or its toxic derivatives
      d.  Beryllium or its toxic compounds
      e.  Brass, zinc or nickel
      f.  Carbon dioxide
      g.  Carbon disulfide
      h.  Carbon monoxide
      i.  Chlorine
      j.  Chrome or its toxic compounds
      k.  Dinitrophenol or its homologues
      l.  Halogen derivatives of hydrocarbon of the aliphatic series
      m.  Lead or its toxic compounds
      n.  Manganese or its toxic compounds
      o.  Mercury or its toxic compounds
      p.  Nitrous fumes
      q.  Phosgene
      r.  Phosphorous or its toxic compounds
      s.  Sulfur dioxide | All work involving exposure to the risk concerned. |

8. Diseases caused by abnormalities in temperature and humidity.
   a. Heat stroke/cramps/exhaustion
   b. Chilblain/frostbite/freezing
   c. Immersion foot/general hypothermia

   All work involving exposure to the risk concerned to excessive heat or cold.
   All work involving exposure to the risk concerned.
   All work involving exposure to the risk concerned.
   All work involving exposure to the risk concerned.

10. Vascular disturbances in the upper extremities due to continuous vibration from pneumatic tools or power drills, chasing machines or hammers.

   Any occupation causing repeated motions, vibrations and pressure of upper extremities.

11. Cardio-Vascular Diseases. Any of the following conditions must be met:
   a. If the heart disease was known to have been present during employment, there must be proof that an acute exacerbation was clearly precipitated by the unusual strain by reasons of the nature of his work.
   b. The strain of work that brings about an acute attack must be sufficient severity and must be followed within 24 hours by the clinical signs of a cardiac insult to constitute causal relationship.
   c. If a person who was apparently asymptomatic before being subjected to strain at work showed signs and symptoms of cardiac injury during the performance of his work and such symptoms and signs persisted, it is reasonable to claim a causal relationship.

12. Cerebro-Vascular Accidents. All of the following conditions must be met:
   a. There must be a history, which should be proved, of trauma at work (on the head specially) due to unusual and extraordinary physical or mental strain or event, or undue exposure to noxious agents in industry.
   b. There must be a direct connection between the trauma or exertion in the course of employment and the worker's collapse.
   c. If the trauma or exertion then and there caused a brain hemorrhage, the injury may be considered as arising from work.

13. Pneumonia. All of the following conditions must be met:
   a. There must be an honest and definite history of wetting and chilling during the course of employment and also, of injury to the chest wall with or without rib fractures, or inhalation of noxious gases, fumes and other deleterious substances in the place of work.
   b. There must be direct connection between the offending agent or event and the seafarer's illness.
   c. The signs of consolidation should appear soon (within a few hours) and the symptoms of initial chilling and fever should at least be 24 hours after the injury or exposure.
   d. The patient must manifest any of the following symptoms within a few days of the accident; (1) severe chill and fever; (2) headache and pain, agonizing in character, in the side of the body; (3) short, dry, painful cough with blood-tinged expectoration; and (4) physical signs of consolidation, with fine rales.

14. Hernia. All of the following conditions must be met:
   a. The hernia should be of recent origin.
   b. Its appearance was accompanied by pain, discoloration and evidence of a tearing of the tissues.
   c. The disease was immediately preceded by undue or severe strain arising out of and in the course of employment.
   d. A protrusion of mass should appear in the area immediately following the alleged strain.

15. Bronchial Asthma. All of the following conditions must be met:
   a. There is no evidence of history of asthma before employment.
   b. The allergen is present in the working conditions
   c. Sensitivity test to allergens in the working environment should yield positive results.
   d. A provocative test should show positive results.

16. Osteoarthritis. Any occupation involving:
   a. Joint strain from carrying heavy loads, or unduly heavy physical labor, as among laborers and mechanics;
   b. Minor or major injuries to the joint;
   c. Excessive use of constant strenuous usage of a particular joint, as among sportsmen, particularly those who have engaged in the more active sports activities;
   d. Extreme temperature changes (humidity, heat and cold environment)
   e. Faulty work posture or use of vibratory tools.

17. Peptic Ulcer.
   Any occupation involving prolonged emotional or physical stress, as among professional people, transport workers and the like

18. Pulmonary Tuberculosis.
   In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving constant exposure to harmful substances in the working environment, in the form of gases, fumes, vapors and dust, as in chemical and textile factories; overwork or fatigue; and exposure to rapid variations in temperature, high degree of humidity and bad weather conditions.

19. Viral Hepatitis.
   In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving: exposure to a source of infection through ingestion of water, milk, or other foods contaminated with hepatitis virus; Provided that the physician determining the causal relationship between the employment and the illness should be able to indicate whether the disease of the afflicted worker manifested itself while he was so employed, knowing the incubation period thereof.

20. Essential Hypertension.
   Hypertension classified as primary or essential is considered compensable if it causes impairment of function of body organs like kidneys, heart, brain and brain, resulting in permanent disability; Provided, that . the following documents substantiate it:
   a. chest x-ray report,
   b. ECG report
   c. blood chemistry report,
   d. fundoscopy report, and
   e. C-T scan

21. Asbestosis. All of the following conditions must be met:
   a. The worker must have been exposed to Asbestos dust in the work place, as duly certified to by the employer, or by a medical institution, or competent medical practitioner acceptable to or accredited by the System.
   b. The chest X-ray report of the employee must show findings of asbestos or asbestos-related disease, e.g. pleural plaques, pleural thickening, effusion, neoplasm and interstitial fibrosis; and
   c. In case of ailment is discovered after the seafarer's retirement/separation from the company, the claim must be filed with the System within three (3) years from discovery.

SECTION 33. TABLE OF OFFENSES AND CORRESPONDING ADMINISTRATIVE PENALTIES

| OFFENSES | ADMINISTRATIVE PENALTIES | |
| --- | --- | --- |
| | SHALL be imposed by the Master | SHALL be imposed by POEA after due investigation |
| 1. Smuggling or violation of any customs rules and regulations of the Philippines and of foreign ports | | |
| a. smuggling any taxable items | Dismissal and to pay cost | 1st Offense: Minimum - one (1) year suspension from POEA Registry Maximum - two (2) years suspension |
| | | 2nd Offense: Minimum - two (2) years and one (1) day suspension Maximum - delisting from POEA Registry |
| b. possession or use of prohibited drugs, narcotics and | Dismissal | Delisting from POEA registry other contraband |
| c. over-running of possession of explosives and the like | Dismissal | Delisting from POEA registry Minimum - 2 years suspension |
| d. shooting or contending with others to commit smuggling | Dismissal | Maximum - 3 years suspension |
| e. misdeclaration of or failing to declare articles loading to their seizure and fine by vessel | Dismissal | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension |
| | | 2nd Offense: Minimum - 2 years and 1 day Maximum - delisting from POEA registry |
| f. misdeclaration of or failing to declare articles leading to their seizure but vessel not implicated | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - 2 years suspension |
| | | 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| g. possession of pornographic materials leading to its seizure and fine to vessel | Dismissal | Same as 1(d) |
| h. any other violation which will not implicate vessel | 1st Offense: Reprimand and warning 2nd Offense: | Same as 1(f) |
| i. any other violation which will implicate the vessel | Dismissal | Minimum - 3 yrs. suspension Maximum delisting from POEA registry |
| 2. Desertion | Dismissal and to pay cost | Permanent Delisting from POEA registry |
| a. deserting or attempting to desert | | |
| b. advising, inspiring or persuading another to desert | Dismissal and to pay cost | Minimum - 6 years suspension Maximum - Delisting from POEA registry |
| 3. Absence without leave | Dismissal and to pay cost | 1st Offense: Minimum - 1 year suspension Maximum - 2 years suspension |
| a. abandoning post or duty without being properly relieved | | 2nd Offense: Minimum - 2 years and 1 day suspension Maximum - delisting from POEA registry |
| b. leaving the vessel without permission from responsible officers during working hours | Dismissal and to pay cost | Same as 3(a) |
| c. entrusting to others assigned duties without authority of department head | At the discretion of Master | 1st Offense: Minimum - 6 months suspension Maximum - 1year suspension |
| | | 2nd Offense: Minimum - 1 year and 1 day suspension Maximum - 2 years suspension |
| | | 3rd Offense: Minimum - 2 years and 1 day suspension Maximum delisting from POEA registry |
| d. leaving the vessel without permission | At the discretion of Master | Same as 3(c) |
| 4. Sleeping on post while on duty | Dismissal and to pay cost | Same as 3(a) |
| 5. Insubordination | Dismissal and to pay cost | Same as 3(a) |
| a. any act of disobedience to lawful orders of a superior officer | | |
| b. attempting to assault a superior officer | Dismissal and to pay cost | Same as 3(c) |
| c. assaulting a superior officer/other person on board vessel with the ship without the use of deadly weapon | Dismissal and to pay cost | Same as 3(c) |

5

| | | |
|---|---|---|
| d. assaulting a superior officer/ other persons on business with the ship with the use of deadly weapon | Dismissal and to pay cost | Delisting from POEA registry |
| e. behaving with disrespect towards a superior officer | Dismissal and to pay cost | 1st Offense: Minimum-9 months suspension Maximum-1 year suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-3 years suspension 3rd Offense: Minimum-3 years and 1 day suspension Maximum-delisting from POEA registry |
| f. insulting a superior officer by words or deed | Dismissal and to pay cost | Same as 5(d) |
| g. inciting another to commit insubordination | Dismissal and to pay cost | Same as 6(a) |
| 6. Drunkenness a. drunk while on duty | Dismissal and to pay cost | 1st Offense: Minimum-2 years suspension Maximum-3 years suspension 2nd Offense: Minimum-3 years and 1 day suspension Maximum-delisting from POEA registry |
| b. creating trouble on board due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(d) |
| c. failure to perform assigned jobs due to intoxication | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 5(d) |
| 7. Creating trouble outside the vessel's premises | Same as 6(a) | Same as 6(c) |
| 8. Gambling a. which results in fighting or any incident as to upset the harmonious relationship on board the vessel | Dismissal and to pay cost | 1st Offense: Minimum-1 year suspension Maximum-2 years suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-delisting from POEA registry |
| b. any other form of gambling which is not purely recreational | At Master's discretion | Same as 5(d) |
| 9. Violation of company policies and regulations a. pilferage or theft of ship's store or cargo | Dismissal and to pay cost | 1st Offense: Minimum-1 year suspension Maximum-2 years suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-delisting from POEA registry |
| b. embezzlement of company funds | Dismissal and to pay cost | Same as 9(a) |
| c. unauthorized disposal of company vessel's properties for personal gain | Dismissal and to pay cost | Same as 9(a) |
| d. any act of dishonesty with intention to defraud the company | Dismissal and to pay cost | Same as 9(a) |
| e. for gross negligence and failure to observe proper storage and cargo handling procedures resulting in delay of vessel and/or damage to cargoes | Dismissal and to pay cost | Same as 9(a) |
| f. failure to observe and comply with regulation and non-baggage shipment and acceptance of parcels on board | At Master's discretion | 1st Offense: Minimum-9 months suspension Maximum-1 year suspension 2nd Offense: Minimum-1 year and 1 day suspension Maximum-2 years suspension 3rd Offense: Minimum-2 years and 1 day suspension Maximum-delisting from POEA registry |
| g. for failure to observe regulations on operation of shore liberty | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | Same as 9(f) |
| h. for being left behind by vessel in foreign port without justifiable reason | Dismissal and to pay cost | Same as 9(f) |

| | | |
|---|---|---|
| i. for disorderly conduct unmannerly act, disrespect towards passengers | Dismissal and to pay cost | 1st Offense: Minimum-1 year suspension Maximum-2 years suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-delisting from POEA registry |
| j. for immorality so as to cast aspersion on the good name of the vessel and company | Dismissal and to pay cost | same as 5(i) |
| k. for inflicting harm or injury to others | Dismissal and to pay cost | same as 5(i) |
| 10. Incompetence and inefficiency | Dismissal and to pay cost | 1st Offense: Minimum-2 years suspension Maximum-3 years suspension 2nd Offense: Minimum-3 years and 1 day suspension Maximum-delisting from POEA registry |
| 11. For losing, wasting, malicious destruction of ship's property or any activity which will hamper the efficient operation of the vessel | Dismissal and to pay cost | 1st Offense: Minimum-2 years suspension Maximum-3 years suspension 2nd Offense: Minimum-3 years and 1 day suspension Maximum-delisting from POEA registry |
| 12. Concerted action to breach approved contracts | Dismissal | 1st Offense: Minimum-2 years suspension Maximum-3 years suspension 2nd Offense: Disqualification from overseas employment |
| 13. Any activity which tends to destroy harmonious relationship of the company | Dismissal and to pay cost | same as 12 |
| 14. Grave abuse of authority a. grave abuse of authority with the use of deadly weapon resulting in harm or injury to subordinate | | Delisting from POEA registry |
| b. grave abuse of authority without the use of deadly weapon resulting in harm or injury to subordinate | Dismissal and to pay cost | 1st Offense: Minimum-2 years suspension Maximum-3 years suspension 2nd Offense: Minimum-3 years and 1 day suspension Maximum-delisting from POEA registry |
| c. any other case of abuse of authority | At Master's discretion | 1st Offense: Minimum-1 year suspension Maximum-2 years suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-3 years suspension |
| 15. For gross misbehavior prejudicial to good order and discipline | 1st Offense: Reprimand and warning 2nd Offense: Dismissal | 1st Offense: Minimum-1 year suspension Maximum-2 years suspension 2nd Offense: Minimum-2 years and 1 day suspension Maximum-delisting from POEA registry |
| 16. Causing through neglect, damage loss, spoilage or deterioration of vessel's stocks and property | At Master's discretion | Same as 16(c) |
| 17. Connivance with or abetting of stowaway | Dismissal and to pay cost | Same as 16 |
| 18. For willfully making false statement, reports, certification or spurious seafarer's documents for personal gain or with intent to mislead or defraud the company | Dismissal and to pay cost | Same as 16 |
| 19. Any other case as to cast aspersion on the good name of the company and vessel | At Master's discretion | Same as 16(c) |
| 20. Violation of safety and environmental rules/regulations | At Master's discretion | Minimum - 1 year suspension Maximum - 2 years suspension |
| 21. Failure to observe the drug and alcohol policy of the company | Dismissal | Minimum-1 year suspension Maximum-2 years suspension |

*This contract is pursuant to DOLE Department Order No. 4, and POEA Memorandum Circular No. 9, both Series of 2000.

SEAFARER     EMPLOYER

DATE: _____

POEA APPROVAL
JUN 2 5 2004

# EXHIBIT 3



# Holland America Line Inc.
## Performance Improvement Notice



WINDSTAR
C R U I S E S
180° FROM ORDINARY

Date: _____ 3/2/2006

Employee Name Romeo Balen

Position: GPA SA

Vessel: ms Westerdam

Employee ID: 52355

Previous Warnings Issued (enter dates):

First: _____   Final: _____

_____   _____

_____   _____

Type of Notice (check):

First Warning: _____

Final Warning: ___X___ _____

Dismissal: _____

Description of situation or problem, including Code of Conduct breached. Attach additional sheets if necessary:
Found to be in violation of MR-1000 Appendix C: Code of Conduct, Page 206. Failure to conform to established guidelines, rules and / or procedures. (Dismissal) In that you have failed to re-pay your monthly reimbursement advance for the month of February.

Actions required by Employee to improve performance. Attach additional sheets if necessary:
Mr Romeo Balen has an obligation to Holland America Line to re-pay his reimbursment advance for his deployment costs on schedule as set out by HAL. Failure to re-pay the advances will lead to furhter and stronger disciplinary action as per attached memo from Jeff Beattie.

Signatures:

*REFUSED TO SIGN.*

Employee: Romeo Balen

*C'ON /CEES VAN) SANTEN*

Dept. Head/Supervisor

Master: Peter Harris

Hotel Manager: Ron Bontenbal

Chief Officer: Marco Carsjens

Security Officer: Andrew Shand

# EXHIBIT 4



## Holland America Line / Windstar Cruises
## Performance Improvement Notice


WINDSTAR
C R U I S E S

| | | | |
|---|---|---|---|
| Date: | 3/3/2006 | Vessel: | Westerdam |
| Employee Name | Balen, Romeo | Employee ID: | 52355 |
| Position: | GPA SA | | |

Previous Warnings Issued (enter dates):

| | | Type of Notice (check): | |
|---|---|---|---|
| First | Final | First Warning: | |
| 3/2/06 | | Final Warning: | |
| | | Dismissal: | X |

Description of situation or problem. Attach additional sheets if necessary:

He was found to be in violation of MR-1000 Appendix C: Code Of Conduct, Performance And Behavior (Performance on the Job), Page 214, • Persistent or willful failure to perform duty.On 3/2/06 Mr. Balen did not reported for duty. 3 times he was requested to report for work by his supervisor but he refused. On 3/3/06 he was requested again to go to work but he refused again.

Actions required by Employee to improve performance. Attach additional sheets if necessary:

Signatures: *Refused to Sign*

Balen, Romeo

Dept. Head/Supervisor - Kees van Santen

Master - Peter Harris

Hotel Manager - Ron Bontenbal

Chief Officer

Chief Engineer

Security Officer - Andrew Shand

Version 1.0

# EXHIBIT 5

06 Dec 2005 10:51
CAPRAPPR
WESTERDAM

HAL - Crew Administration and Payroll
ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT

Page: 1
Ship:

| Per ID | Name | CDF ID | PNC ID | Total Obligation | Monthly Obligation | | |
|--------|------|--------|--------|------------------|--------------------|--|--|
| 52355 BALEN, ROMEO | | 2 | 530 | $2,119.00 | Current | | $2,119.00 |
| Cntrct Start Date: 10/01/05 | | | | $0.00 | Previous | | |
| Cntrct End Date: 09/29/06 | | | TOTAL | $2,119.00 | $211.00 | $0.00 | $2,119.00 |

| | Total Paid This Month | Remaining Obligation | Delinquent Obligation | Minimum Payment | Month Applied |
|--|----------------------|---------------------|----------------------|-----------------|---------------|
| Payment – WE | 10/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | SEP |
| Payment – WE | 11/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | OCT |
| Payment – WE | 12/01/05 | $275.00 | $1,844.00 | $211.00 | $422.00 | NOV |
| Current Amount Due | 12/06/05 | $.00 | $1,844.00 | $.00 | $422.00 | |

Paymaster signature: _____

Amount Received: _____

Crewmember signature: _____

Key: 1658
THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

30 Jan 2006 08:40
CAPSAPPR
WESTERDAM

Page: 1
Ship:

HAL - Crew Administration and Payroll
ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT

| Per ID | Name | CDF ID | FNC ID | Total Obligation | Monthly Obligation |
|---|---|---|---|---|---|

52355 BALEN, ROMEO
Cntrct Start Date: 10/01/05

Cntrct End Date:   09/29/06

2   530   $2,119.00 Current
                $0.00 Previous
                -----------
        TOTAL   $2,119.00        $211.00        $0.00        $2,119.00
                ==========

| | Total Paid This Month | Remaining Obligation | Delinquent Obligation | Minimum Payment | Month Applied |
|---|---|---|---|---|---|
| Payment - WE | 10/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | SEP |
| Payment - WE | 11/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | OCT |
| Payment - WE | 12/01/05 | $275.00 | $1,844.00 | $211.00 | $422.00 | NOV |
| Payment - WE | 01/10/06 | $.00 | $1,844.00 | $147.00 | $358.00 | DEC |
| Payment - WE | 01/30/06 | $.00 | $1,844.00 | $.00 | $569.00 | |
| Current Amount Due | | | | | | |

Paymaster signature:

Amount Received: ___$300___

Crewmember signature: _____

Key: 1658
THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

```
07 Feb 2006 15:01                        HAL - Crew Administration and Payroll                    Page:
CAPRAPPR                                 ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT               Ship:
WESTERDAM

                                              CDF    FNC         Total      Monthly
Per ID                Name                     ID     ID      Obligation   Obligation

 52355 BALEN, ROMEO                            2     530    $2,119.00   Current
Cntrct Start Date: 10/01/05                                     $0.00   Previous
                                                           -----------
Cntrct End Date:    09/29/06                   TOTAL       $2,119.00      $211.00      $0.00        $2,119.00
                                                          ===========
```

| | Total Paid This Month | Remaining Obligation | Delinquent Obligation | Minimum Payment | Month Applied |
|---|---|---|---|---|---|
| Payment - WE | 10/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | SEP |
| Payment - WE | 11/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | OCT |
| Payment - WE | 12/01/05 | $275.00 | $1,844.00 | $211.00 | $422.00 | NOV |
| Payment - WE | 01/10/06 | $.00 | $1,844.00 | $147.00 | $358.00 | DEC |
| Payment - WE | 02/03/06 | $300.00 | $1,544.00 | $358.00 | $569.00 | JAN |
| Current Amount Due | 02/07/06 | $.00 | $1,544.00 | $.00 | $569.00 | |

Amount Received: _____

Paymaster signature: _____

Crewmember signature: _____

Key: 1274
THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

January 12th, 2006

Dear crewmember,

Please be informed that you are behind with paying off your advance reimbursement costs and you will have to catch up with your payments before the end of this month.
This is done by paying your minimum payment (the yellow highlighted amount) this month (February).
If you can afford to pay the amount at once, you only have to come to final payday.
If you want to pay it in two times, make sure you come to mid payday and final payday.

When you do not catch up with your payments, you will be expected in the Hotel Manager's office the day after payday to receive a PIN.

Please do not hesitate to contact me if you have any questions.

With kind regards,

Christina Huischer
Paymaster Westerdam

17 Feb 2006 16:20
CAPRARPR

HAL - Crew Administration and Payroll
ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT

Page: 1
Ship: WESTERDAM

Per ID          Name

52355 BALEN, ROMEO
Cntrct Start Date: 10/01/05

Cntrct End Date:   09/29/06

| | CDF ID | FNC ID | Total Obligation | Monthly Obligation |
|---|---|---|---|---|
| | 2 | 530 | $2,119.00 | Current |
| | | | $0.00 | Previous |
| | | TOTAL | $2,119.00 | $211.00 |
| | | | $2,119.00 | $0.00 |

| | Total Paid This Month | Remaining Obligation | Delinquent Obligation | Minimum Payment | Month Applied |
|---|---|---|---|---|---|
| Payment - WE   10/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | SEP |
| Payment - WE   11/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | OCT |
| Payment - WE   12/01/05 | $275.00 | $1,844.00 | $211.00 | $422.00 | NOV |
| Payment - WE   01/10/06 | $.00 | $1,844.00 | $147.00 | $358.00 | DEC |
| Payment - WE   02/03/06 | $300.00 | $1,544.00 | $358.00 | $569.00 | JAN |
| Current Amount Due   02/17/06 | $.00 | $1,544.00 | $.00 | $569.00 | |

Paymaster signature:

Amount Received: _____

Crewmember signature: _____

Key: 1274
THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

17 Feb 2006 16:20
CAPRARWS

HAL - Crew Administration and Payroll for
ADVANCE REIMBURSEMENT COLLECTION WORKSHEET

For Date: 02/17/2006

Ship: WESTERDAM

Contract: 2 - FILIPINO - AMOSUP
Department: 21 - FOOD PREPARATION

| Crew ID | Function | Obligation Current | Obligation Delinq | Monthly Amount | Paid To Date | Remain Balance | Due: Delinq Portion | Total Amount | Paid |
|---|---|---|---|---|---|---|---|---|---|
| 52355 | 530 GRA SA | 2119.00 | 0.00 | 211.03 | 575.00 | 1544.00 | 269.00 | 480.00 | |

PayMaster: _____     Crew Member: _____

*(handwritten)*

On board for 4 months
should have paid 4 · #211 = #844.
Paid = #575    to be paid
= #844/-
= #575 · 4 - #305/11/5

```
23 Feb 2006 15:46                        HAL - Crew Administration and Payroll                          Page: 1
CAPRAPPR                             ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT                          Ship:
WESTERDAM

                                             CDF    FNC       Total     Monthly
Per ID                Name                    ID     II    Obligation  Obligation

52355 BALEN, ROMEO                             2    530   $2,119.00   Current
Cntrct Start Date: 10/01/05                                    $0.00   Previous
                                                          ----------
Cntrct End Date:   09/29/06                   TOTAL  $2,119.00       $211.00              $0.00        $2,119.00
                                                    ==========
```

|  |  | Total Paid This Month | Remaining Obligation | Delinquent Obligation | Minimum Payment | Month Applied |
|---|---|---|---|---|---|---|
| Payment - WE | 10/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | SEP |
| Payment - WE | 11/10/05 | $.00 | $2,119.00 | $.00 | $211.00 | OCT |
| Payment - WE | 12/01/05 | $275.00 | $1,844.00 | $211.00 | $422.00 | NOV |
| Payment - WE | 01/10/06 | $.00 | $1,844.00 | $147.00 | $358.00 | DEC |
| Payment - WE | 02/03/06 | $300.00 | $1,544.00 | $358.00 | $569.00 | JAN |
| Current Amount Due | 02/23/06 | $.00 | $1,544.00 | $.00 | $569.00 |  |

Paymaster signature: _____

Amount Received: _____

Crewmember signature: _____

Key: 1274
THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

```
03 Mar 2006 22:29              HAL - Crew Administration and Payroll                    Page: 1
CAPRARPPR               ADVANCE REIMBURSEMENT RE-PAYMENT STATEMENT                       Ship: WESTERDAM

Per ID              Name                        CDF   FNC      Total      Monthly
                                                ID    ID    Obligation   Obligation

 52355 BALEN, ROMEO                              2    530   $2,119.00 Current
Cntrct Start Date: 12/01/05                                    $0.00 Previous
                                                           -----------
Cntrct End Date:   03/03/06              TOTAL  $2,119.00               $211.00              $0.00        $2,119.00
                                               ===========

                            Total Paid   Remaining    Delinquent   Minimum    Month
                            This Month   Obligation   Obligation   Payment   Applied

Payment - WE     10/10/05      $.00      $2,119.00       $.00      $211.00      SEP
Payment - WE     11/10/05      $.00      $2,119.00       $.00      $211.00      OCT
Payment - WE     12/01/05   $275.00      $1,844.00    $211.00      $422.00      NOV
Payment - WE     01/10/06      $.00      $1,844.00    $147.00      $358.00      DEC
Payment - WE     02/03/06   $300.00      $1,544.00    $358.00      $569.00      JAN
Current Amount Due 03/03/06    $.00      $1,544.00       $.00      $569.00

Amount Received: _____        Paymaster signature: March 3rd 2006

Crewmember signature: _____

Key: 1274
  THIS STATEMENT MUST BE BROUGHT TO THE FINAL PAYDAY/COLLECTION OF THE MONTH.

03 Mar 2006 22:29           HAL - Crew Administration and Payroll for
CAPRARWS                 ADVANCE REIMBURSEMENT COLLECTION WORKSHEET                     Ship: WESTERDAM

                                              For Date: 03/03/2006
Contract: 2 - FILIPINO - AMOSUP
Department: 21 - FOOD PREPARATION

                    Obligation         Monthly    Paid    Remain    Due: Delinq   Total
Crew ID  Function  Current  Delinq     Amount  To Date   Balance   Portion      Amount   Paid
-------  --------  -------  ------     ------  -------   -------   ---------    ------   ----
 52355  530 GPA SA 2119.00    0.00     211.00   575.00   1544.00    489.00      691.00   _____

  PayMaster: _____        Crew Member: _____
```

# EXHIBIT 6

## Questions and Answers
## Beverage Service Charge Plan

We have listed below questions that some of you may have on the new Beverage Service Charge Plan and our answers. If you have additional questions, please contact your Supervisor who will either be able to answer your question or find someone who can.

*Question: Why are we changing compensation systems?*

Answer: For many years, Holland America Line had a "Tipping Not Required" policy. This created confusion among our guests as to whether they should tip, who they should tip and how much to tip. This confusion resulted in crewmembers receiving different compensation for doing excellent work at the same job. Furthermore, most other cruise lines have gone to a system where gratuities or service charges are added to guest bills. Our guests from North America are accustomed to providing gratuities or paying service charges for good service.

*Question: Can you provide me with a general description of the new plan structure?*

Answer: All wine attendants, beverage attendants, bartenders, bar supervisors and GPA Bars are participating in this Beverage Service Charge Plan. There is a separate Hotel Department Gratuity Plan for all other Hotel Department KPI and AMOSUP petty officers and crewmembers. A separate set of Questions and Answers is being provided to participants in the Hotel Department Gratuity Plan.

For every wine or other beverage order, we will add a mandatory 15% service charge to the bill. This will be automatically included by the computer on the bill that you present to passengers for their signature.

In the case of sales by wine attendants, the 15% is divided 9.7% to the wine attendant that made the sale (including both bottle and drink by the glass sales) with the balance going into a service charge pool. For sales by beverage attendants and bartenders, the 15% is divided 14.4% to the beverage attendant or bartender that made the sale with the remaining 0.6% put into the service charge pool. The service charge pool is shared by bartenders, bar supervisors and GPA bars based on a point system (a certain number of points are allocated to each position).

The actual amount of service charges you receive each pay period generally depends on the number of voyages that ended during that pay period and the volume of sales. Our expectation is that you will earn 8% more than we estimate someone in your position earned in 2003. For wine attendants and beverage attendants only, this comparison is being made with reference to the compensation system in effect during the first several months of 2003 rather than the current system that began towards the middle of 2003. This early 2003 system is referred to in these Questions and Answers as the 2003 Pooled Plan.

Under the new system, you will be required to reimburse Holland America for certain costs that we incur on your behalf such as transportation to and from the ship. Your wage rates, your share of estimated service charges, the Guarantee Amount described below and the expected 8%

compensation increase goal have all been calculated taking this reimbursement obligation into account. In other words, even after taking into account this reimbursement obligation, our mutual goal is to see you earn 8% more.

Finally, we have included a Guarantee Amount for every position. As explained below, this will ensure that even if the plan does not work as expected, you are guaranteed a certain level of compensation that is close to what we estimate the average person in your position would have earned during 2004 had this new plan not been adopted. In the case of wine attendants and beverage attendants only, this is based on what we estimate the average person in your position would have earned in 2004 had we been operating 2003 Pooled Plan.

This plan will be implemented beginning around May 1, 2004. The exact implementation date will vary by ship.

Together with these Questions and Answers, you are receiving a letter which shows:

- The average monthly compensation we estimate the typical person in your position earned in 2003 (early 2003 - under the 2003 Pooled Plan - for wine attendants and beverage attendants).
- The average monthly compensation we estimate the typical person in your position will earn under the new plan after taking into account the costs that you will be reimbursing Holland America Line for.
- The annual Guarantee Amount for your position based on working 12 months.
- The initial crew costs (Reimbursement Amount) for your position.

You should refer to that letter for purposes of the questions and answers below.

The success of our Company depends on the number of guests we serve. To a great extent, the number of guests choosing Holland America will depend on the level of service that each and everyone of you provide. If you maintain excellent service, we will have more guests and you will earn more.

*Question: Why are you referring to the 2003 Pooled Plan for wine attendants and beverage attendants rather than our current compensation system?*

With the benefit of experience, we have concluded that the current compensation plan for wine attendants and beverage attendants has been a total failure. We have not seen any increase in revenue but instead have experienced a significant increase in costs. Given this, we have decided that the current plan should not be used as a reference point for any future compensation plan. Therefore, we are using the 2003 Pooled Plan as the starting point for wine attendants and beverage attendants.

*Question: How does the Guarantee Amount work?*

Answer: We fully expect that you will earn more than your Guarantee Amount. The only reason for that not happening is if beverage sales are below expectations. Since this is a new program

2

for Holland America Line, we were not prepared to take any chances with your livelihood. Consequently, if you complete your contract and your total NET PAY, including your share of service charges, ends up being less than your Guarantee Amount, we will pay you the difference before you leave the ship.

*Question:   The letter I received refers to an annual Guarantee Amount.   Is that my actual Guarantee Amount no matter how long I work?*

Answer:  Your actual Guarantee Amount will depend on the number of months you work on the ship. For example, if your annual Guarantee Amount is $8,000 and you only work 10 months on the ship, your actual Guarantee Amount for that contract is $6,667 (10/12ths of $8,000).

*Question:   What do you mean by net pay?*

Answer:  Under this new program, you will be required to reimburse Holland America for certain costs we incur on your behalf such as transportation to and from the ship, visa costs, and uniform costs. A full list is provided below. "Net pay" refers to your compensation after you have reimbursed us for these costs. In other words, the actual Guarantee Amount is the amount you are guaranteed to receive in addition to the amount that you are paying us back as reimbursement. For example: If your actual Guarantee Amount is $6,667 and the amount you have to reimburse us is $2,000, that means that your actual total compensation (wages plus service charges) will at least be $8,667 so that you are guaranteed to keep $6,667.

*Question:  How did Holland America Line determine the Guarantee Amount?*

Answer:  For bartenders and bar supervisors, the Guarantee Amount equals 80% of what we believe the average person in your position would have earned during 2004, including estimated gratuities, had this new plan not been adopted. For wine attendants and beverage attendants, the Guarantee Amount equals 80% of what we believe the average person in your position would have earned during 2004, including estimated gratuities, had we been operating under the 2003 Pooled Plan. For GPA Bars, the Guarantee Amount equals 95% of what we believe the average person in your position would have earned during 2004 had this new plan not been adopted. A lower percentage is being used for bartenders, bar supervisors, wine attendants and beverage attendants in order to make sure these persons pay special attention to their dealings with guests as their work is particularly critical to sales volume.

*Question:  How does the guarantee work if I leave the ship before my contract is completed?*

Answer:  If you quit or are fired, the guarantee does not apply. In that case, you will only keep the money you have actually earned. If you have to go home for other reasons, your actual Guarantee Amount is still computed on the basis of the actual time worked. Therefore, if you work only six months your actual Guarantee Amount will be half of the annual Guarantee Amount stated in the letter you received.

*Question:  How will the guarantee work this first year since I will have started my current contract before this new plan begins?*

3

Answer: The actual Guarantee Amount will be based on the number of months you work after the plan is implemented around May 1, 2004. In other words, if you work three months after the plan is implemented, your actual Guarantee Amount for the remainder of the current contract will be 25% of the annual Guarantee Amount that is shown on the letter you received with this set of Questions and Answers. I want to remind you again, however, that you are expected to earn more than your Guarantee Amount. The guarantee is only there to provide you with firm assurances as we introduce this new program.

*Question: I have the same question on the reimbursement I have to pay to Holland America Line for air costs and similar items during my current contract?*

Answer: The total reimbursement amount for your position, before any proration, is included in the letter you received with these Questions and Answers. Your actual reimbursement amount for the current contract will be less, depending on the months you remain on the ship after the plan is implemented. If, for example, your reimbursement amount is $2,000 and you work three months after the plan is implemented, your reimbursement amount in the current contract would only be $500 (3/12ths of $2,000). For future contracts beginning after the plan is implemented, there is no proration of the Reimbursement Amount regardless of how long you are on the ship.

*Question: When do I have to pay Holland America the Reimbursement Amount?*

Answer: If the annual Guarantee Amount for your position is $12,000 or more, you will pay Holland America the reimbursement amount in 10 equal portions on your first 10 paydays. That means that if your reimbursement amount is $2,000, you will pay Holland America $200 on each of your first 10 paydays. If the annual Guarantee Amount for your position is at least $10,000 but less than $12,000, the normal rule will be that you will pay Holland America the reimbursement amount in 16 equal portions on your first 16 paydays ($125/payday if your reimbursement amount was $2,000). If the annual Guarantee Amount for your position is less than $10,000, the normal rule will be that you will pay Holland America the reimbursement amount in 20 equal portions on your first 20 paydays ($100/payday if your reimbursement amount was $2,000). The Purser will give you your entire pay. You will be required to hand back to the Purser your reimbursement amount.

*Question: What if I have less than 10, 16 or 20 pay periods remaining in my current contract?*

Answer: The prorated portion of your reimbursement amount ($500 in the example above) will be reimbursed by you in equal amounts over your remaining pay periods.

*Question: How is the reimbursement amount determined?*

Answer: The reimbursement amount for your existing contract is in the letter you received with these Questions and Answers. That will be the reimbursement amount for anyone starting a contract for your position before the plan is implemented around May 1, 2004.

4

For persons starting contracts after the plan is implemented, every three months (on May 1st, August 1st, November 1st, and February 1st of each year), we will compute the average cost of the reimbursable items for your position based on the costs as they exist on that date. The amount we compute will then become the reimbursement amount for everyone hired into your position during the following three months. For example, if the reimbursement amount computed on August 1, 2004 is $2,000 for your position, that means that everyone hired to your position between August 1, 2004 and October 31, 2004 will have a reimbursement amount of $2,000.

Once you are hired, your reimbursement amount will not change during that contract even if the costs change. That means that you are not at risk should air costs, for example, increase after you are hired. This also means that the reimbursement amount shown on the letter you have received will NOT change for your current contract. Remember again that for your current contract, your actual reimbursement amount will be less since it will be based on the number of months you remain on the ship after the plan is implemented.

*Question: What costs are included in this reimbursement amount?*

Answer: The crew costs included in the reimbursement amount are:

- Transportation to and from the ship including air, hotels, transfers and meals
- Uniforms
- Visa Costs
- Union Dues
- Medical Exams

*Question: If I have to reimburse the Company for these expenses, doesn't that mean I am taking a pay cut?*

Answer: Absolutely not. The amount of your projected wages, your share of service charges as well as the Guarantee Amount have all taken this reimbursement obligation into account. Everything has been computed so that you receive extra wages and service charges sufficient to make up for this reimbursement amount.

*Question: Will the reimbursement amount be different for people who join or leave the ship in ports where it is more expensive to fly in or out of?*

Answer: We recognize that air costs do vary by port. For example, air costs to or from Florida may be more expensive than the fare to or from Los Angeles, Seattle or Vancouver. To simplify the process and avoid penalizing crewmembers for having to join or leave the ship in a more expensive port, we have calculated the reimbursement amount on a fleetwide basis. Consequently, reimbursement amounts by position are identical across the entire fleet.

*Question: I do not understand the number in my letter which says what the average 2003 monthly wages were?*

5

Answer: We looked at every position that will be participating in this new plan. We knew how much each position was receiving in base wages. We also knew the average amount each position was earning for overtime, vacation, travel days, holidays, and bonuses. For those positions which we know generally received gratuities directly from guests, we did a survey to find out what the average gratuities were. Based on all this information, we estimated what we thought the average total monthly compensation in 2003 was for your position (early 2003 for wine attendants and beverage attendants). We then used that number to calculate your new base wages and allocate service charges in order to provide you with the 8% compensation increase we are all trying to achieve with this program.

*Question: What if I actually earned more or less than that per month in 2003?*

Answer: All we could do was compute an average. While we know that calculations such as this are never perfect, we have done the best we could to calculate a fair number, and one that should be very close to your actual earnings last year.

*Question: How will I get an 8% compensation increase?*

Answer: The service charges have been allocated so that each of you will get approximately an 8% compensation increase if sales volumes achieve expectations. We made this 8% calculation recognizing that on some sailings, sales volumes will not be what we desire. On others, however, they should exceed projections. Your compensation necessarily depends on how well you and the other members of your team sell wine and other beverages.

*Question: The letter I received says that under the new plan, I will be getting an average of a certain amount per month in 2004 after the plan begins. Does that mean I get that amount each month?*

Answer: That will not be the exact amount you receive each month. The exact amount will depend on the total sales volume. If our expected sales are achieved, then the average amount shown on your letter is what we expect you will receive.

*Question: When will I be paid under the new plan?*

Answer: There will be two paydays every month, on approximately the 1st and 15th of the month. The exact payday will depend on the itinerary of each ship. On each payday, you will receive your share of service charges for those voyages which ended during the pay period. If there is a situation where the ship is on a long voyage during a pay period which has not yet ended by the payday, your share of service charges for the portion of the voyage during the pay period will be estimated. Base wages will still be paid only once per month on one of the two monthly paydays.

*Question: How does this system impact allotments that are being sent to my home country on my behalf?*

6

Answer: We will continue to provide you with the opportunity to send allotments back to your home country.

*Question: In the past, I have earned extra compensation by doing additional jobs such as, for example, spot lights during the production show. What happens with these under the new plan?*

Answer: Those opportunities will still exist. That will not change under the new plan.

*Question: In the past, we were paid a premium to handle non-revenue bar events such as travel agent luncheons or company events. How will these be handled?*

Answer: While a premium will not be paid, these events will be considered when we plan rotations to that no one has an unfair share of these events. The 8% compensation increase was calculated on the assumption that some of these events would occur.

*Question: What if a guest wants to give me a personal gratuity?*

Answer: A guest can still do that although you should do absolutely nothing to encourage this. You should not solicit or expect to receive personal gratuities.

*Question: What happens if a guest objects to the service charge?*

Answer: Refer the matter to your supervisor who will explain to the guest that service charges are mandatory. If the guest still objects, the service charge should be removed from the bill and your supervisor should advise the Hotel Manager so that he can decide whether to discuss this with the guest. Under no circumstances should you or your supervisor get into an argument with a guest.

*Question: Can I work out an arrangement where I get credit for sales by another crewmember?*

Answer: Absolutely not. If any crewmember takes any action designed to give themselves credit for sales made by another crewmember, the offending crewmember will be subject to discipline up to and including immediate termination.

*Question: Isn't it unfair if I get assigned to a bar that regularly gets less business?*

Answer: You will be rotated between bars to ensure that everyone has an equal earning opportunity.

*Question: Since you are discontinuing the pension plan, what does that mean for the amounts I have earned under the pension plan in prior years?*

Answer: Anything that you were entitled to under the pension plan for your work in prior years will not be impacted. Furthermore, for those crewmembers who are not fully vested, the vesting will continue as you work additional years. The total amount of your possible pension, however,

will not increase even if you work additional years.   In addition, no new crewmembers will be added to the pension plan.

*Question: How does the new overtime arrangement work?*

Answer:   Overtime is paid for hours worked in excess of 330 hours per month (assuming a 30-day month).  The overtime rate is 1.25 times your base wage.

*Question:  What if it turns out that the new plan is not working as Holland America expects it to work?*

Answer:  We have promised both KPI and AMOSUP that we will be closely monitoring the program.  We will promptly correct any problems that we find.  This new plan is intended to be a WIN-WIN-WIN program for you, Holland America Line and our guests.  We intend to make sure that happens.

TIPPING BEVERAGE-Q&A
2/6/04

8

# EXHIBIT 7

# Explanation deployment costs

With the implementation of the new program the Filipino and Indonesian crew needs to pay the deployment costs separate from their wages. This is in accordance with a new American law that prohibits employers from deducting such costs directly.

An amount has been calculated for the two nationalities separately:
- Indonesian crew $1,931
- Filipino crew $2,120

The terms over which these amounts need to be paid are established by the annual guarantee for your position according a tier system:
- Tier 1; Annual guarantee below $10,000 → pay over 10 months
- Tier 2; Annual guarantee between $10,000 and $11,999 → pay over 8 months
- Tier 3; Annual guarantee over $12,000 → pay over 5 months

| PER MONTH | Tier 1 | Tier 2 | Tier 3 |
|-----------|--------|--------|--------|
| Indonesian | $193.10 | $241.38 | $386.20 |
| Filipino | $212 | $265 | $424 |

For example;
A cabin steward has an annual guarantee of $17,318. This means he is paying the deployment costs according to Tier 3, over 5 months.
He will be paying $1,931 : 5 = $386.20 per month for 5 months in a row.

An assistant baker has an annual guarantee of $11,424. This means that he will be paying the deployment costs according to Tier 2, over 8 months.
He will be paying $2,120 : 8 = $265 per month for 8 months in a row.

An overview of the annual guarantee is available with HRO/ Paymaster in the crew office.

## EXCEPTION: CONTRACT STARTED BEFORE IMPLEMENTATION DATE

For the crewmembers that have joined the ship before the implementation date, the amount has been prorated for the rest of the contract, starting as of the implementation date (May 7 for the Prinsendam).

This means that you only need to pay for the days you are onboard during the new program.

An example:

An Indonesian crew member's contract is from August 23, 2003 until August 9, 2004 and has an annual guarantee of $12,100.

He will be paying the prorated amount from May 7 until August 9, 2004 thus for 94 days.
The prorating is as follows: $1,931 : 365 days x 94 days onboard = $497.30 deployment costs to be paid for the rest of the contract.

The first month he pays $304.73 (May has 24 days in the new program)
The second month he would pay $ 386.20 according to the tier system.
However, his balance is only $497.30 - $304.73 = $192.57, thus this is the amount he will pay for June. In July and August he will NOT be paying any deployment costs anymore as his obligation was fulfilled after the second month already. He will be collecting his full earnings.

Same calculation goes for a Filipino crewmember that has an annual guarantee of $6,000 and has a contract from January 26, 2004 until January 13, 2005.
The prorated amount will be 2,120 : 365 x 251 days onboard = $1,457.86 for the rest of the contract in the new plan.
He will pay $193.10 (will be rounded of to $193) per month as he is in Tier 1, paying over 10 months. After 7 months of paying the monthly obligation, his balance will be $1,457.86 – (7 months x $193) = $1,457.86 - $1,351 = $106.86
This is the amount he will pay in December, the 8th month of payment of deployment costs. He fulfilled his obligation for his current contract and no longer needs to pay the deployment costs.

Of course you also have the possibility to pay off the full lump sum of your obligation. As soon as you paid off your obligation, you will be receiving your full pay and no longer having to pay the deployment costs.

In the case of extended contracts there is a difference made in crewmembers that were onboard before implementation and those who joined the ship after implementation.
If you joined after implementation, nothing changes; you will pay off the full $1,931 or $2,120 depending on your nationality.

If you were onboard before implementation, the extended days will be prorated as above, and your total obligation will increase accordingly.

Questions! You can come by the crew office during opening hours. The more than happy to reply in the best way possible. As the system is new to from your questions asked, so do not hesitate!

# EXHIBIT 8

**PRDM-Paymaster**

| | |
|---|---|
| **From:** | Peijs, John (HAL) |
| **Sent:** | Thursday, May 27, 2004 10:43 PM |
| **To:** | PRDM-Paymaster |
| **Cc:** | NODM-Paymaster; RYDM-Paymaster; PRDM-Purser; PRDM-Hotel Manager; Beattie, Jeff (HAL) |
| **Subject:** | RE: Deployment Costs |

Sarah,

Everyone is entitled to a new uniform at the start of their next full contract, also the people that have been wearing the same uniform for 5 years. The Petty Officers and others wearing the Officer Blue/White Uniforms (FDA for example) will keep their uniforms for 2 contracts but will pay the deployment costs for each of those contracts. The reason is that these uniforms are more elaborate to produce and more expensive and it wouldn't be fair to increase the deployment costs of all crew for that reason.

The meal cost is a small amount and because of the overall cost averaging only a fractional cost component. Since it was part of the overall traveling costs it is included but not used by everyone and therefore low.

I believe if there is a concern after this message below that you should talk with the Hotel Manager to handle this further.

Ty

John

-----Original Message-----
| | |
|---|---|
| **From:** | PRDM-Paymaster |
| **Sent:** | Thursday, May 27, 2004 12:13 PM |
| **To:** | Peijs, John (HAL) |
| **Cc:** | NODM-Paymaster; RYDM-Paymaster; PRDM-Purser; PRDM-Hotel Manager |
| **Subject:** | RE: Deployment Costs |

Hi John,

Thank you very much for this breakdown of the deployment costs.

Here onboard the crew has actually been waiting for a breakdown of these costs in figures or percentages; they want to know exactly how these are set up. Especially in regards to the uniforms; some crew members have been wearing the same uniform for five years already. They feel that if they have to pay for uniforms per year, they should get a new set every year. also the meals is a part they do not really agree with.

How do we explain this to them?

Thanks and regards,

Sarah

-----Original Message-----
| | |
|---|---|
| **From:** | Peijs, John (HAL) |
| **Sent:** | Thursday, May 27, 2004 10:03 PM |
| **To:** | HAL DistList: Hotel Managers |
| **Cc:** | HAL DistList: Pursers; Byers, Wayne (HAL); Groothuizen, Johan (HAL); Goodwin, Paul (HAL); Beattie, Jeff (HAL); Zackrone, Valentina (HAL); Suchyar, Ade (HAL); AMDM-Paymaster; MADM-Paymaster; NODM-Paymaster; OSDM-Paymaster; PRDM-Paymaster; RTDM-Paymaster; RYDM-Paymaster; SADM-Paymaster; VEDM-Paymaster; VODM-Paymaster; WEDM-Paymaster; ZADM-Paymaster; ZUDM-Paymaster |
| **Subject:** | FW: Deployment Costs |

1

*There continue to be questions from the fleet on how the Deployment Costs are calculated.*

We used budgeted average costs for each nationality as follows:

**Air** - We used the average round trip air to all home ports world wide to come up with an air average by nationality.

**Hotel, Meals and Transfers** - This calculation was derived in the same manner as air.

**Uniforms** - We used the average uniform cost by nationality.

**Medical Exams** - We used the actual cost of exams.

**Visa's** - We used 20% of the cost for US visa's as they usually are good for 5 years. For Schengan, Canadian and Brazilian Visa's we use the total number of visa's in each area divided by the total population to obtain an average cost.

**Recruiting Costs** - We used the average recruiting costs by nationality

**Union Dues** - We used the average union dues by nationality.

These how the Deployment Costs have been calculated. The biggest portion of this cost is air, for the Filipino Crew this is about 60% of the cost, for the Indonesian Crew 50% . The company has selected world wide averages versus individual itineraries for the calculation for the air expense.

The actual costs are reviewed on an annual basis and enhancements will be made based on these reviews so that the deployment cost might fluctuate from year to year. The components and the calculation and these components is not expected to change however.

Please share this information with your crew and keep on file for future questions regarding this

Ty

John

# EXHIBIT 9

LETTER FOR ALL BEVERAGE STAFF

February 10, 2004

Fellow Holland America Line Employee:

Title: Beverage Attendant - Male

     Holland America Line is entering an exciting time for both guests and crew. In order for us to maintain the leadership role in the premium segment of the cruise industry, we have introduced the Signature of Excellence Initiatives. These initiatives will bring large changes to all aspects of our product.

     Other changes we are making include an end to our "Tipping Not Required" program. Our Chairman, Kirk Lanterman, notified everyone of this pending change this past December. We will now be collecting gratuities and service charges directly from guests. All amounts collected will be directly distributed to participating Hotel Department employees. The new program, which will be introduced about May 1, 2004, will consist of two plans: A Beverage Service Charge Plan for wine attendants, beverage attendants, bartenders, bar supervisors and OPA Bars; and a Hotel Department Gratuity Plan which covers all other Hotel Department KPI and AMOSUP petty officers and crewmembers.

     We have designed this program to motivate all Hotel Department employees, including those people who have not traditionally received gratuities, to work together with the common goal of giving outstanding service to all of our guests. Expressions like "not my job" need to belong to the past. If everyone works together, our guests will show their appreciation by paying larger gratuities that will, in turn, go directly to you and your fellow crewmembers.

     The attached questions and answers will give you details of the plan which applies to you. There are several key numbers under the plan that are specific to your position:

- $1,085. This represents the estimated average 2003 monthly compensation for your position, including overtime, vacation, travel days, holidays, contract return and completion bonus, seniority/ longevity bonus, living allowance and estimated gratuities.
- $1,261. This represents the monthly amount we expect someone in your position will earn under the new plan, including both base wages and gratuities. This amount represents the average compensation we expect you will keep after paying us the crew costs (Reimbursement Amount).
- $11,210. This is the annual Guarantee Amount for your position based on 12 months worked and after your Reimbursement Amount has been paid.
- $2,214. This is the initial annual Reimbursement Amount for your position.

The actual Guarantee Amount and Reimbursement Amount for your current contract will be less since you began working your current contract prior to May 1, 2004.

     The success of this program is directly tied to maintaining the excellent service that Holland America Line is known for. I'm sure that with the dedication of our amazing crew, this program will be an astounding success and will contribute to keeping Holland America Line at the top of the premium cruise market.

Stein Kruse
President and Chief Operating Office

# EXHIBIT 10

# HANDOUTS OF HAL
# POLICIES
# &
# PROCEDURES

# PHILIPPINES

## HISTORY

The Philippine Islands have been inhabited throughout human history. To this day, one can find human cultures at every level of technology living there. Many Filipinos live in modern, bustling Pacific Rim cities, while others live in isolated tropical jungles at a stone-age level of civilization. ( The Tasaday tribe of hunter-gathers on Mindanao Island only came into contact with the outside world in 1971.)

This cultural diversity began in the tenth century A.D., when the Chinese began to trade with the Filipinos. Eventually, some Chinese stayed in the Philippines. Although the ethnic Chinese today represent only 3 percent of the Philippine population, they control about half of the nation's commerce and banking. While many prominent Filipinos have Chinese ancestry (including Corazon Aquino), there is considerable hostility toward the Chinese dominance of business.

Arab traders introduced Islam to the Philippines in the fourteenth century. Concentrated in the southern islands, these Muslims fiercely resisted both Spanish and American authority. Their refusal to yield to colonial overlords is a source of pride to many Filipinos, Muslim and Christians alike.

The Portuguese navigator Magellan led a Spanish fleet to the Philippines in 1521 and named the islands after King Philip ll of Spain. The Spaniards ruled for 350 years and brought Catholicism to the islands, as well as the Latino attitudes and traditions that are now a major part of the Filipino makeup. The Spanish language and culture never became totally dominant in the Philippines, perhaps because Spain did not rule directly. The Philippines were overseen indirectly, via Mexico.

After the Spanish-American war, the Philippines were ceded to the United States in 1899. Already fighting against their Spanish overloads, the Filipinos had no desire to be ruled by another colonial power. The so-called Philippines insurrection against the United States lasted over 12 years and cost the lives of hundreds of thousands of Filipinos. After the war, the U.S. brought infrastructure development to the country. It was in the U.S.- built public schools that English became the language of education. Under U.S. control, the nation became the Commonwealth of the Philipppines in 1935.

The Japanese conquered the Philippines in 1941, demonstrating to the Filipinos that the United States was not unbeatable. The Philippines were liberated in 1945 by Allied troops, both U.S. and Filipino. Full independence for the Philippines came in 1946.

## LAND AND CULTURE

Of the Philippines's 7,107 islands, only 25 have towns. Most of the population lives on eleven main islands, of which Luzon and Mindanao are the largest. Many islands are mountains, and there is a potential for volcanic and earthquake activity throughout the country. ( The 1991 eruption of Mt. Pinatubo buried entire villages and affected global weather patterns through 1993.)

The climate is generally tropical and humid. Philippine soil is very fertile; 26 percent is suitable for cultivation. The rainy season extends from June to October. Typhoons are likely from June to November, but they may occur during any season because the Philippines is in the typhoon belt.

## POPULATION

The Philipppines population, 69.8 million, is growing at 1.9 percent per year. About 40 percent is under age 15. More than 9 million people live in Metropolitan Manila.

## LANGUAGE

English and Filipino are official languages. English is the main language of business, government and education. Efforts in the 1960s and 1970s established Filipino as the official language. Most people refer to Pilipino as Tagalog, Pilipino is based on Tagalog.

## RELIGION

Approximately 83 percent of Filipinos profess to be Roman Catholics but traditional beliefs remain strong. While only 9 percent of Filipinos are Protestant, that percentage is growing, with Evangelical sects growing fastest. Muslims number about 5 percent of the population and are concentrated in the southern islands.

## EDUCATION

Education is highly valued in the Philippines. Young children can attend kindergarten at age five and pre-school before that. Nearly all children begin six years (June-March) of elementary school at age six or seven. A few schools have a seventh year of elementary education. Four years of high school follow for 70 percent of all children. One year of military training is included in the high school curriculum. Graduation is at age 16 or 17.Many go on to college or vocational training. The literacy rate is 90 percent.

## GENERAL ATTITUDES

Filipinos have been influenced by the Chinese, Malayan, Spanish and U.S. cultures. Consequently, many aspects of these different cultures are evident in Filipino society. Listed below are some aspects of the Filipino culture:
- Although casual and fun loving, Filipinos are sensitive people; insincerity is easily detected and can ruin a relationship.
- Individualism is less important than family.
- Bringing shame to individual reflects on their family and is avoided at all costs.
- Interdependence is more important than independence.
- Making social relationships run smoothly is considered more important than expression, personal view or delivering bad/unwanted news.
- Fatalism is a common attitude, characterized by the expression " Bahala na", which means, roughly, " Accept what comes and bear it with hope and patience."
- Filipinos are open to information but do not change their attitude readily.
- Most of the truth comes from immediate feelings.
- They become personally involved in problems rather than using rules and laws to solve them.
- Individual act in the context of the group, thus they seek the consensus of the group.
- It is difficult for them to confront and to give an outright " no". This means a Filipino is likely to say " yes" to a question because they do not want to offend you. "Yes" can mean anything from " I agree" to " maybe" to " I hope you can tell from my lack of enthusiasm that I really mean " no".
- Filipinos are very status- conscious. This can extend to issues of race- for example, the lighter the skin, the high the status. (Whites can often get things done that darker-skinned people cannot.)
- While foreigners are not expected to smile as much as Filipinos, they are expected to restrain their temper. One who expresses anger in public has shamefully lost face and respect.

## PROTOCOLS

Because of the years of U.S. military presence in the Philipppines, most North America greetings and gestures are recognized. Listed below are those unique to the Philippines:
- Initial greetings are friendly and informal, handshakes are firm.
- Most Filipinos have nicknames, many of which may sound strange to you. Once you are invited to address him or her by a nick name, you are expected to do so.
- Hand movement is not excessive in conversation.
- Raising the eyebrows can mean " hello" or " yes".
- Since pointing can easily be taken for an insulting gesture, Filipinos rarely indicate objects or directions by pointing with their fingers. Instead they indicate with a glance or by pursing their lips.
- Staring has various meanings in the Philippines, most of them negative. Foreigners should avoid staring at Filipinos, who can easily interpret a stare as belligerence. If you are stared at,look away.
- To beckon someone , you hold your hand out, palm downward and make a scooping motion with the fingers. Beckoning someone with the palm up and wagging one finger can be construed as an insult.
- To stand tall with your hands on your hips is always interpreted as an aggressive posture. Worse, it expresses an aggressive challenge and in the Philippines, belligerence is often met with belligerence.

13